```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   CENTRAL DIVISION AT LEXINGTON


 3                            - - -
     UNITED STATES OF AMERICA,      .   Case No. 5:19-CR-0056-1
 4                                  .
              Plaintiff,            .
 5                                  .   Lexington, Kentucky
          - v -                     .
 6                                  .   Wednesday, December 11, 2019
     RICHARD EUGENE DERRINGER,      .   9:01 a.m.
 7            Defendant.            .
                                    .   - - -
 8
                  TRANSCRIPT OF SENTENCING PROCEEDINGS
 9              BEFORE THE HONORABLE DANNY C. REEVES
                 UNITED STATES DISTRICT COURT JUDGE
10
                             - - -
11

12   For the United States:      MARY MELTON, ESQ.
                                 Assistant U.S. Attorneys
13                               United States Attorney's Office
                                 260 West Vine Street, Suite 300
14                               Lexington, Kentucky  40507

15   For the Defendant           C. WILLIAM SWINFORD, JR., ESQ.
     Richard Derringer:          271 West Short Street, Suite 505
16                               Lexington, Kentucky  40507

17   Court Reporter:             LINDA S. MULLEN, RDR, CRR
                                 Official Court Reporter
18                               101 Barr Street
                                 Lexington, Kentucky  40507
19

20

21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23

24

25
```

1          (Proceedings in open court, December 11, 2019, 9:01 a.m.)

2          THE COURT:  Thank you.

3          Madam Clerk, would you call the matter scheduled for 9:00,

4     please.

5          THE CLERK:  Yes, Your Honor.  Lexington Criminal Action

6     Number 19-56, United States of America versus Richard Eugene

7     Derringer, called for hearing and sentencing.

8          THE COURT:  Thank you.

9          Would counsel state their appearances, please.

10         MS. MELTON:  Good morning, Your Honor.  Mary Melton on

11    behalf of the United States.

12         THE COURT:  Thank you, Ms. Melton.

13         Mr. Swinford.

14         MR. SWINFORD:  Good morning, Your Honor, William Swinford.

15    In light of the motion, I'll just say William Swinford, I'm

16    here on behalf of Mr. Derringer until further Court rulings.

17    Mr. Derringer is seated to my right.

18         THE COURT:  Thank you.

19         This matter is originally scheduled for a sentencing

20    hearing this morning.  Before we proceed with the hearing,

21    there are a couple of matters to take up.

22         First, I do want to confirm that Mr. Derringer had an

23    adequate opportunity to discuss the presentence report with his

24    counsel.

25         Mr. Swinford, have you met with Mr. Derringer to discuss

1   the presentence report?

2       MR. SWINFORD:  Yes, Your Honor.  I have met with

3   Mr. Derringer on several occasions to discuss the report.

4       THE COURT:  All right.

5       MR. SWINFORD:  He has been brought to Lexington, where a

6   copy of the report was provided to him to read and to discuss.

7   Of course, pursuant to the Court's standing rules or orders,

8   he's not allowed to have that report with him in the facility

9   so it was taken back from him.

10      In addition, there have been several video conferences

11  with Mr. Derringer about the report, the objections and the

12  addendum to the report through video conferencing.

13      THE COURT:  All right.

14      Is that correct, Mr. Derringer?  Is that correct,

15  Mr. Derringer?

16      THE DEFENDANT:  I did not get to read the last -- excuse

17  me.  I did not get to read the last packet that you sent me.

18      MR. SWINFORD:  Well, you know, I have provided him with

19  copies of a lot of things, but not the presentence

20  investigation report.

21      Other than in this courthouse, where the United States

22  Marshals have instructions, I guess from the Court, whatever,

23  to take the presentence report away from the defendant before

24  he's transported back.  I have someone looking at one now

25  downstairs.

1        THE DEFENDANT:  The thing you sent in the last.

2        MR. SWINFORD:  The last thing I sent in the mail?

3        THE DEFENDANT:  Yes, sir.

4        MR. SWINFORD:  I sent you several things in the mail, it

5   wasn't the presentence report.

6        THE DEFENDANT:  It was the prosecution's revised something

7   to it.

8        MR. SWINFORD:  It was the prosecution's supplemental

9   sentencing memorandum, which was filed under seal.  That was

10  sent to him at the Grayson County Detention Center.  I have no

11  reason why -- I know of no reason why he was not able to access

12  that.

13       I can tell you this.  From conversations with the Grayson

14  County jailer himself through email, not -- you know, he has

15  been subject to some disciplinary actions.  That may have

16  curtailed his ability to get those.  But if we're going to

17  proceed, if the Court will give me a few minutes, I'll be glad

18  to go over that with him.

19       THE COURT:  Well, my question is really for purposes of

20  Rule 32.  The defendant has the right to review his presentence

21  report and discuss it with counsel.  The rule does not state

22  that he's entitled to have a copy of the report.  Based on your

23  representations, I do feel that Rule 32 has been fully complied

24  with and we'll proceed at this time.

25       The second issue before we proceed with sentencing deals

1   with a request for appointment of new counsel.  As Mr. Swinford

2   had indicated, Mr. Derringer has submitted a letter to the

3   Court in which he complains of counsel for a couple of reasons;

4   claiming that he failed to file a motion for mental health

5   evaluation; that he should have withdrawn for health reasons;

6   and that he's made statements indicating that the defendant

7   should receive a term of incarceration.

8        So I'll allow the parties to address that issue at this

9   time.  Mr. Derringer, you're entitled to have counsel at all

10  critical stages of the proceeding, but you can't use a request

11  for counsel in an attempt to delay proceedings.

12       So if you do have reasons why you believe Mr. Swinford

13  cannot adequately represent you at this time, you may outline

14  those to me and I'll consider your request.

15       THE DEFENDANT:  Could I have my legal work brought up to

16  me, please?

17       THE COURT:  You need to speak up, sir.

18       THE DEFENDANT:  Could I have my legal work brought up to

19  me, please?

20       THE COURT:  Where is his legal work?

21       THE DEFENDANT:  In the van.

22       THE COURT:  Do you have that?  All right.

23       The third issue that I do want to advise the parties of is

24  I was notified by the marshal immediately before this

25  proceeding starting that Mr. Derringer apparently attacked the

1    codefendant in the transport to Lexington today and she's

2    seeking medical attention at this time.  I don't know if that

3    would affect the parties' intentions on proceeding at this

4    point.  But, Ms. Melton, if you believe that would be an issue

5    that should be taken up in advance of the sentencing, I'll

6    alert you to that at this time.

7        MS. MELTON:  Your Honor, the conduct that took place this

8    morning, to the extent that it's true, and I think the Court

9    would probably have to make a finding on that, is certainly

10   relevant to the history and the characteristics of the

11   defendant as it pertains to this sentencing today.

12       However, in light of the other enhancements that the

13   defendant is already subject to, I'm not sure that we need to

14   take that up for the purposes of this sentencing today.

15       THE COURT:  That could be the subject of a separate

16   proceeding, separate criminal proceeding, if there is

17   information presented to the grand jury that would support the

18   information provided by the marshal.

19       MS. MELTON:  Yes, Your Honor.

20       THE COURT:  All right.

21       Mr. Swinford, I hesitate to take a recess.

22       MR. SWINFORD:  I can -- Your Honor, I can address the

23   health issue, if the Court is inclined to hear that.

24       I'm reluctant to address anything else because -- I have

25   not received any indication that the attorney-client privilege

1    with respect to him has been waived.

2        THE COURT:  We will take that up in an in-camera

3    proceeding when the materials are brought up this morning.

4        MR. SWINFORD:  Do you want me to address the health issue?

5        THE COURT:  If you wish, yes, sir.

6        MR. SWINFORD:  Your Honor, I did have a stroke on Father's

7    Day, June 5th, most of the people in the courthouse were aware

8    of that, perhaps you were.

9        THE COURT:  I know Judge Hood was certainly aware of that

10   and did not indicate that there was any problem with your

11   representing the defendant during the trial of the action, as

12   the record is clear.  This matter was presented for trial

13   before Judge Hood.  And after he had a health issue, then the

14   matter was reassigned to me at that point.

15       MR. SWINFORD:  Well, I appreciate that.  I did get a clean

16   bill of health from my medical doctor.  I'm still being

17   followed by my medical doctor, and I'm on blood pressure

18   medication.  And it has reduced my blood pressure quite a bit.

19   That's what it was.

20       And the trial was on August 13th.  I was hospitalized for

21   four days.  I was back in the office ten days after the

22   incident.  And I have not noticed, my doctor hasn't noticed, my

23   wife, my secretary, and my coworkers have noticed no mental

24   deficits or any issues with respect to my health.

25       So that I would like to, you know, report to the Court.

1   Thank you.

2        THE COURT:  All right.  Yes, sir.

3        While we're waiting for those materials to be brought up

4   at Mr. Derringer's request, I will note for the record that I

5   have reviewed the entire file of this matter, including the

6   transcription of the testimony that has been filed in the

7   record of the victim in the case.

8        I've also asked the court reporter to prepare a draft of

9   the remaining portions of trial testimony and I have reviewed

10  that draft.  It has not been filed in the record but that

11  material has been reviewed.

12       And I've also reviewed all of the parties' filings as

13  indicated, and the exhibits that are referenced in the

14  presentence report, including the various video clips, the

15  23 video clips that are the subject of certain objections, and

16  that do result in certain enhancements being applied in the

17  presentence report.

18       All right.  Do we have those materials delivered?

19       THE MARSHAL:  Yes, Your Honor.

20       THE COURT:  All right.  The way we'll proceed at this

21  time, inasmuch as the defendant has made assertions that he

22  should have new counsel appointed to represent him at this

23  time, I'll ask all individuals that are not court personnel, as

24  well as the United States, to step outside.  And as soon as I

25  have addressed these matters in camera, I'll bring you back in

1    and you may provide the Court with any additional information,

2    Ms. Melton, that would bear on this issue.

3        MR. SWINFORD:  Your Honor, may my secretary, who has gone

4    to get a book for me, when she comes, can she come in?  She's

5    with my office.

6        THE COURT:  Yes.  I don't know that the security officers

7    will be able to identify her, but yes.

8        MR. SWINFORD:  You've seen her, she's pregnant.  Six

9    months pregnant.

10       THE COURT:  All right.  As soon as she comes, she may come

11   into the courtroom.

12       (U.S. Attorney left the courtroom.)

13       THE COURT:  All right.  Mr. Derringer, you have asserted

14   that the Court should appoint new counsel to represent you.

15   You've made claims that there was not a mental health

16   evaluation performed, and I don't know that there's anything in

17   the record that would support that.

18       But if you had conversations with Mr. Swinford about that,

19   or any other matters that you think would prevent him from

20   adequately representing you at this time, you can go over those

21   with me.

22       THE DEFENDANT:  Your Honor, is it okay if I stand up?

23       THE COURT:  No, sir.  You can remain seated.  I can't hear

24   you if you stand up.

25       THE DEFENDANT:  They can't find my other glasses, and I

1    don't know if I can get far enough away with these to see.

2        THE COURT:  Well, then, stand up if you need to.

3        THE DEFENDANT:  Thank you, I appreciate it.

4        The reason I seek a new counsel was all the way back to my

5    trial about -- I mean, I didn't have any defense at my trial.

6    We were unprepared.  And I mean --

7        THE COURT:  What defenses were not asserted that you

8    wanted to assert in the case?

9        THE DEFENDANT:  Sir?

10       THE COURT:  What defenses were not asserted that you

11   wanted to assert in the case?

12       THE DEFENDANT:  Well, my testimony, witness testimony

13   about drugs and their effects on decision making.

14       Mr. Swinford did write a letter to someone.  Maybe he can

15   tell you why that I did not testify at my trial.

16       THE COURT:  Yes, sir.  I'm assuming that you had a

17   conversation with your attorney about that decision, and I'll

18   be asking him that in just a moment.

19       THE DEFENDANT:  We did.  And he said that he didn't even

20   have questions ready for me at the trial, and it will do no

21   good for me to testify.

22       THE COURT:  Had you testified, would you have denied the

23   assault on the victim?

24       THE DEFENDANT:  No, sir.

25       THE COURT:  Would you have denied that you gave her and

1   forced her to take methamphetamine before assaulting her?

2        THE DEFENDANT:  No, sir.

3        THE COURT:  What would have been the basis of your

4   testimony in defense of your case?

5        THE DEFENDANT:  Refuting Jackie Land's testimony and her

6   descriptions of what was going on during all the videos,

7   because that was her personal opinion.  There was no audio and

8   it was just her on her coaching through the videos.

9        THE COURT:  Yes, sir.  I watched the videos and Ms. Land

10  was cross-examined rather extensively by your attorney.

11       THE DEFENDANT:  Well, and I suggested several questions

12  for him to ask.  She testified that she had never been -- that

13  she did not use drugs and several things to that.  And I've got

14  several papers here to contradict that myself.  And I got those

15  from Mr. Swinford, so I know he has them.

16       If I can see this --

17       THE COURT:  That would not have been necessarily relevant

18  to the proceeding, inasmuch as Mr. Swinford asked the witness

19  specifically whether she used drugs.  She denied it.  And

20  there's no indication that she was using on the date in

21  question.

22       THE DEFENDANT:  Well, that just goes for her truthfulness.

23       THE COURT:  The truthfulness of the witness's statement

24  was supported by the victim's testimony as well as the videos

25  themselves.

1        Mr. Swinford was effective in cross-examining the witness

2   inasmuch as the jury did return a verdict of not guilty as to

3   one count.  So the Court has a hard time finding that he was

4   ineffective.  As a matter of fact, I find just to the contrary,

5   that he was very effective in defending you in the case against

6   very strong evidence.

7        THE DEFENDANT:  And --

8        THE COURT:  What would you have testified to had you been

9   called as a witness?

10       THE DEFENDANT:  Whatever he saw fit to ask me to help them

11  know that she was lying.

12       THE COURT:  And had you been called as a witness, the

13  United States could have then put into evidence many of your

14  prior convictions.

15       THE DEFENDANT:  I have zero prior convictions.

16       THE COURT:  You have 24 criminal history points, sir.

17       THE DEFENDANT:  I have zero prior convictions for sexual

18  assault, sir.

19       THE COURT:  Doesn't have to be related to sexual assault.

20       THE DEFENDANT:  I mean, I have nothing that favors

21  anything to do with a category like this.

22       THE COURT:  You have several convictions, sir, that could

23  have been used in impeachment of you.

24       You have 24 criminal history points.  It takes 13 criminal

25  history points -- excuse me -- 10 to 13 to be in criminal

 1  history category VI.  So you're two times what's necessary to

 2  be in the highest criminal history category.

 3       THE DEFENDANT:  Yes, sir.  But it's money related.  It's

 4  checks.  It's --

 5       THE COURT:  What is "money related" and "checks"?

 6       THE DEFENDANT:  I mean, like I said, it's credit card

 7  things, it's bad checks.

 8       THE COURT:  About what, your criminal history?

 9       THE DEFENDANT:  Yes, sir.

10       THE COURT:  Yes.  You have a lot of criminal history and

11  it's varied, there's no doubt about that.

12       THE DEFENDANT:  Yes, sir.  I mean, I'm not debating that.

13  When I get this paper I'm trying to find right here in a

14  second, sir.  If I could see better, it would help me go

15  faster.

16       And the PSR report, as far as here today, it still states

17  in there the thing that we beat, which was the distribution of

18  porn.  That I never -- I never had the phone that Jackie had.

19       THE COURT:  Yes, sir.  Your attorney has objected to the

20  inclusion of that information.  But the Court may consider

21  acquitted conduct.  And we'll get to that in the objections, so

22  we're not to that point yet.

23       THE DEFENDANT:  Okay.

24       THE COURT:  Under the definition in the statute, under the

25  guidelines, distribution can include attempted distribution.

 1   And, again, the Court may consider acquitted conduct in making

 2   that determination.

 3        THE DEFENDANT:  I should be getting closer here, Your

 4   Honor.  I appreciate your patience.

 5        A-ha.  It's always at the bottom of the pile, isn't it?

 6   This is from Mr. Swinford.  "Dear Mr. Derringer, now that the

 7   United States has superseded the indictment and named you

 8   with" -- can you read that?  It keeps going blurry for me,

 9   Mr. Swinford.

10        MR. SWINFORD:  "Has superseded the indictment and named

11   you with attempt," it's attempt to distribute, "it will be

12   incumbent on you to testify because the only way to rebut the

13   knowledge element after Jackie takes the stand is to testify

14   that you never had the phone."

15        This was written on July 30th.  "This is a dangerous

16   exercise."  You taking the stand.  "I have enclosed Jackie's

17   criminal history.  It basically is nothing.  There is nothing

18   in her criminal history that" would -- "we could use to impeach

19   her testimony.  We will have to think of another way."  And

20   another way would be of taking the stand.

21        THE COURT:  Yes, sir.  So you did --

22        THE DEFENDANT:  But it is incumbent that I testify.  And

23   then when my trial came up, he didn't even have questions

24   prepared.

25        THE COURT:  Well, the letter indicates that that is one

1    way, the primary way, in which you could impeach her testimony,

2    is by your testimony, which would contradict that.  But then he

3    points out the dangers in you taking the stand and testifying.

4        So he does indicate that that is one way to impeach her

5    testimony, but then, as a good attorney would do, tells you the

6    dangers of doing so.

7        THE DEFENDANT:  Right.

8        THE COURT:  So there's nothing improper about that letter

9    or about his information to you at that time.

10       The issue before me now is whether I should appoint new

11   counsel to represent you going forward.

12       Now, you can raise these issues, which would be akin to

13   habeas issues, at this time.  And if I make rulings on those,

14   then you may be foreclosed from raising those later.  But you

15   can raise those and I'll address those now.

16       But in order to obtain new counsel, you need to tell me

17   why Mr. Swinford cannot adequately represent you in the

18   sentencing proceeding that's about to take place in the case.

19       Why do you feel he can't adequately represent you?  It's

20   not based on a letter where he told you that you would have to

21   make a decision about whether to testify or not.

22       Your letter to me indicates that he failed to file a

23   motion for a mental health evaluation, and I don't know that

24   that was ever an issue raised in the case by anyone.  If it

25   was, you can tell me about that.

1       And if there are any other issues that you feel would

2   prevent Mr. Swinford representing you adequately --

3       THE DEFENDANT:  He doesn't believe in my innocence.  He

4   believes I should go to prison.

5       THE COURT:  Well, sir, your innocence -- your guilt, your

6   guilt has been determined in the case.

7       THE DEFENDANT:  Right.

8       THE COURT:  And during the trial, because of the videos --

9       THE DEFENDANT:  I --

10      THE COURT:  -- excuse me, sir -- because of the videos

11  that were introduced by the government, it was readily apparent

12  that you had assaulted a young lady, a lady under the age

13  of 12.

14      His argument before the jury was that the matter shouldn't

15  have been prosecuted federally, that it should have been

16  prosecuted in state court in an attempt to get an acquittal

17  here.

18      I don't know what evidence there would be or what evidence

19  you could present that would somehow indicate that you did not

20  assault the young lady.

21      Now, the argument that Mr. Swinford made was that that

22  should not have been a case charged federally for production or

23  conspiracy to produce child pornography.  He made those

24  arguments to the Court and to the jury.

25      THE DEFENDANT:  Well, Your Honor, I wasn't charged with

1   the assault.  I was charged with the production of it.

2        THE COURT:  Yes, sir.  You were charged with production.

3        THE DEFENDANT:  And that --

4        THE COURT:  And there was testimony presented during the

5   trial that would support that verdict of conspiracy to produce

6   visual depictions of a minor engaged in sexually explicit

7   conduct; and of aiding and abetting the production of visual

8   depictions of a minor engaged in sexually explicit conduct; as

9   well as possessing matters containing visual depictions of

10   minors engaged in sexually explicit conduct; and of

11   distributing methamphetamine.

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  There was evidence that supported all of those

14   counts for which you were convicted.

15        The fact that Mr. Swinford may or may not think that you

16   are guilty or innocent is not an issue.  The question is

17   whether he effectively represented you either in the past or

18   going forward.  And you haven't given me any indication that he

19   did not represent you effectively in the past.  And the

20   question now is whether he can effectively represent you going

21   forward.

22        And tell me why he cannot do that.

23        THE DEFENDANT:  I don't know how to tell you.

24        THE COURT:  All right.

25        Mr. Swinford, I have a couple of questions for you.

1          MR. SWINFORD:  Yes, Your Honor.

2          THE COURT:  They relate to this claim of a mental health

3     evaluation.

4          MR. SWINFORD:  Should I stand up, Your Honor?

5          THE COURT:  You're not required to, but if you wish.

6          MR. SWINFORD:  Okay.

7          THE COURT:  Sometimes if there's noise outside, it's

8     helpful if you get closer to the microphone.

9          MR. SWINFORD:  Okay.

10         THE COURT:  The issue is this mental health evaluation,

11    whether it was ever discussed, presented to the Court, debated

12    among you and Mr. Derringer.

13         MR. SWINFORD:  Your Honor, it was not discussed prior to

14    the trial or during the trial.

15         THE COURT:  I know it was raised afterwards.

16         MR. SWINFORD:  It was raised afterwards simply -- there's

17    two ways to get a mental evaluation, as the Court's aware.  One

18    of them is in aid of sentencing.  And I did file that motion,

19    unsupported with anything, and the Court overruled the motion,

20    said it was not timely.  And I went back and looked at the rule

21    and it was not timely.

22         But I can tell you this.  He never raised that issue until

23    after the trial.  He never -- according to information, direct

24    conversations with Michelle Rankin, the jailer at Woodford

25    County, where he was incarcerated first, according to

1    information raised from the Grayson County Detention Center, he

2    never asked either facility to see a mental health

3    professional.

4          THE COURT:  Did you have any reason to believe that an

5    evaluation should be requested prior to trial?

6          MR. SWINFORD:  No, Your Honor.  I thought he was competent

7    to stand trial and understood, and we were able to communicate,

8    I thought, effectively.  I thought he understood it.

9          THE DEFENDANT:  Your Honor?

10         THE COURT:  Yes, sir.

11         THE DEFENDANT:  We -- I had spoke to Mr. Swinford about

12   needing some mental health help since I met him.

13         THE COURT:  There's a difference between needing some help

14   and needing an evaluation to determine if you had --

15         THE DEFENDANT:  We came to the courthouse to have a

16   hearing on it, and he said there's no sense in having it and

17   sent me back that day.

18         THE COURT:  And I have not seen anything at all either in

19   the record or based upon your conversations here today that

20   would indicate that, if requested, it would have been granted,

21   that there was a basis for it.

22         So I don't find that there was a basis then, I don't find

23   that there's basis for it now.  Just because you may have

24   wanted it to be performed does not mean the Court would have

25   granted the request.

1   Now, are there any other issues that you believe would

2 prevent Mr. Swinford from adequately representing you in the

3 sentencing hearing that's about to take place?

4   THE DEFENDANT:  Yes, sir.  Could I re-address that issue

5 real quick?

6   THE COURT:  Yes, sir.

7   THE DEFENDANT:  I was brought over here by Mr. Swinford to

8 have a mental health hearing.  And he told me it would do no

9 good at the time and sent me back.  We never made -- I never

10 made it out of the little room downstairs.  I don't know what

11 that date was.

12   THE COURT:  All right.

13   Mr. Swinford.

14   MR. SWINFORD:  Your Honor, I don't recall that.  I had him

15 brought here, as the marshals can verify, several times for

16 several conversations.  There were no hearings scheduled for

17 most of those conversations.  They had to put him in a van with

18 other defendants who were being transported here for hearings.

19 That's how it works.

20   THE COURT:  Yes, sir.

21   THE DEFENDANT:  This was when I was still Woodford County,

22 sir.

23   THE COURT:  So that would have been pretrial?

24   THE DEFENDANT:  Yes, sir.

25   THE COURT:  Well, again, I find nothing in the record that

1    would support a request for a mental health evaluation

2    pretrial, if it had been requested.  And so the fact that you

3    claim that you thought you needed one is not dispositive of the

4    issue.  The issue is whether Mr. Swinford either was

5    ineffective in the past or would be in the future, or could not

6    represent you effectively by virtue of the fact that he did not

7    request an exam that was not necessary.

8        I don't find that's a reason to replace counsel at this

9    stage of the proceeding.  I don't find that you've provided any

10   reasons at all, legitimate reasons, for having new counsel at

11   this point; and, therefore, I will deny the request at this

12   time.

13       THE DEFENDANT:  How do -- how do -- I don't know how to go

14   about getting any help, because I keep asking everybody where

15   I'm at.  And like I said, I spoke to Mr. Swinford about it

16   since I met him, whenever I first got federal charges and he

17   introduced me to him.  And he keeps saying, well, we'll see,

18   we'll see.  I'll check in on it.  And obviously nothing's

19   happened.

20       THE COURT:  Yes, sir.  Mr. Derringer, let me be clear.

21   You have not shown any reason for the Court to direct a mental

22   health evaluation to be performed, either in the past or at

23   this time going forward.

24       THE DEFENDANT:  Well, I mean, that's what happened this

25   morning, is I just --

1    THE COURT:  Well, I would suggest that you may not want to

2  make factual statements on the record that could be used

3  against you with regard to potential criminal charges that

4  might be filed for assault of a federal inmate.

5    THE DEFENDANT:  Yes, sir.

6    Well, can I ask you if I can get some help, please?

7    THE COURT:  I've just told you, you're not entitled to it

8  at this point because you haven't shown a reason for it.  You

9  haven't shown a reason for a mental health evaluation or mental

10 health treatment.

11    Now, you may need some treatment, you may need some

12 treatment for being a pedophile for assaulting an 11-year-old

13 girl.  That's separate and apart from a different mental health

14 evaluation that you're requesting.

15    THE DEFENDANT:  Your Honor, I mean, there's just a pile of

16 stuff --

17    THE COURT:  Yes, sir.  There is a pile of stuff.  And

18 we're going to address that in just a moment, that pile of

19 stuff that you referred to.

20    THE DEFENDANT:  Yes, sir.

21    THE COURT:  But it's not a mental health evaluation that,

22 if it had been requested in the past, would have been

23 appropriate.

24    MR. SWINFORD:  Your Honor, could I ask for just a minute

25 respite break?

1          THE COURT:  Yes, sir.

2          MR. SWINFORD:  If that's okay.

3          THE COURT:  You need a restroom break?

4          MR. SWINFORD:  Yes, Your Honor.

5          THE COURT:  We're going to take about a three-minute break

6     to allow you to go outside.  We're going to keep the defendant

7     in the courtroom.  Is he shackled and cuffed?  He will remain

8     shackled and cuffed for the remainder of this proceeding.

9          We will be in a short recess.

10          (A recess was taken from 9:31 a.m. to 9:35 a.m.)

11          (U.S. Attorney present in courtroom.)

12          THE COURT:  All right.  Thank you.

13          Outside the presence of the public and the United States,

14     I conducted a hearing under Sixth Circuit authority *Iles* and

15     *Benitez* which indicates that any time there is an issue that

16     has been raised about whether there's a conflict between the

17     defendant and counsel, whether the Court should appoint new

18     counsel to represent the defendant going forward.

19          I do not find that the defendant has offered any cause for

20     replacing counsel at this time.  While the defendant complains

21     of various decisions previously made that would be akin to

22     issues that could be raised under the Title 28, Section 2255, I

23     do not find that any are appropriate or fact based.

24          Likewise, I do not find that there is a breakdown in

25     communications that would prevent Mr. Swinford from continuing

1    to represent the defendant going forward in this proceeding.

2         Instead, I do find that the defendant raises the issue in

3    an attempt to delay proceedings, which would be an improper

4    reason to grant the motion for replacement of counsel.  So the

5    letter that has been filed, and I believe docketed as a motion,

6    will be denied as being without basis.

7         I'll proceed with the sentencing hearing at this time.  I

8    will note for the record that, in addition to the presentence

9    report, I have received a statement from the identified victim

10   in the case.  I have received the memos that have been filed by

11   the attorneys with respect to their respective positions.

12        Turning to the presentence report.  There are numerous

13   objections that have been filed to the report.  Those are

14   identified in the addendum to the presentence report, and we

15   will go through those objections at this time.

16        The first objection, the defendant objects to the conduct

17   that's set forth in paragraphs 5 through 25 of the presentence

18   report and has offered his own version of the offense conduct.

19        As indicated, I have reviewed the entire record of the

20   proceeding as well as the draft of the transcription of the

21   trial and the section that has been filed in the record.  And I

22   will be prepared and can address any specific objections that

23   the parties may wish to raise at this time with regard to those

24   enumerated paragraphs, which would be 5 through 25.

25        Mr. Swinford, turn to you the first.

1          MR. SWINFORD:  Your Honor, I submitted to the probation

2     office, and I assume you have the one that has the yellow

3     highlights in it?

4          THE COURT:  Yes, sir, I do.

5          MR. SWINFORD:  Those are what I believe the evidence was

6     from the trial.  I don't think the United States and I differ

7     that much, although reading the United States' sealed

8     sentencing memorandum, she seems to believe that we -- it's

9     argumentative and that we do differ a lot.

10         But if you start with like paragraph 6, which is the first

11    one, I merely added the part that the victim went to the hotel

12    room and knocked on the door where Walls-Land was staying,

13    occupying, and Derringer.  And that Walls-Land exited the room

14    and spoke to her in the hallway.  And she asked if -- I think

15    that's accurate, that's in the testimony.  I don't know what

16    the objection could be about that.

17         The only reason for the inclusion of that would be to

18    buttress my argument that it was Walls-Land who was the

19    supervisor or custodian of the victim and that's who the victim

20    sought out.

21         THE COURT:  That relates to what would be the legal

22    objection that has been made to paragraphs 36 and other

23    paragraphs that apply an enhancement under 2G2.1(b)(5).

24         MR. SWINFORD:  It would be.  But I think I have to give a

25    basis for that.  That's why I included that language in my

 1  recitation of the facts.

 2       THE COURT:  All right.

 3       MR. SWINFORD:  So the next one is in numerical

 4  paragraph 7.  And, again, I'll refer to the victim as the

 5  victim or D.M., if that's with the Court's permission.

 6       THE COURT:  Yes, sir.

 7       MR. SWINFORD:  That she testified that Derringer never

 8  looked back in the direction of Walls-Land.  She further

 9  testified that she believed Derringer was unaware that

10  Walls-Land was recording the events on her cellular telephone.

11       THE COURT:  Whether she believed it or didn't believe it

12  is not the dispositive issue.  Because we do have testimony

13  from Walls-Land that would support that conclusion, number one.

14       And, number two, we have further testimony toward the end

15  of Walls-Land's cross-examination or direct examination where

16  she indicated that she had actually moved the camera at his

17  direction to film better.  And that relates to video clips 22

18  and 23.

19       MR. SWINFORD:  I understand, Your Honor.  This is my

20  problem.  This is where I disagree with the United States'

21  theory of the case and Ms. Kimberly Kidd's, you know,

22  statements to me.  And I have the utmost respect for her, the

23  agent, but you have to believe Walls-Land to do that.

24       THE COURT:  Well, there's more to it than just that,

25  Mr. Swinford.

1      THE DEFENDANT:  Can I say something?

2      MR. SWINFORD:  No.

3      THE COURT:  There's also the series of text messages.

4  There's the testimony of Walls-Land where she talks about

5  their, her and Mr. Derringer's, prior sexual relationship.  The

6  problems that he was having, his desire to have videos of

7  children.  I'll leave it at that.

8      So you have the lead up to the events that happened on

9  March 11th.  And then you have the text messages that stop the

10 time Ms. Walls-Land gets in the vehicle.  And then you have her

11 testimony and you also have the videos themselves.  And

12 Mr. Derringer being in the van for several hours while this was

13 occurring.  Ms. Walls-Land getting in and out of the van and

14 getting back in.

15     And then, again, her testimony that she moved to take

16 better video images of certain activity.  That's reflected

17 toward the 22nd and 23rd video clips.  And so there is abundant

18 testimony to establish that the defendant directed the

19 activities.

20     Now, your argument really goes toward whether it was

21 sufficient evidence for a conviction.  But there's also

22 sufficient evidence for this information to be included in the

23 presentence report.

24     So your objection to that, in that regard, would be

25 overruled.

1          MR. SWINFORD:  Thank you, Your Honor.

2          Mr. Derringer is whispering in my ear that he wants to

3     address the Court.  I told him this is argument.

4          THE COURT:  Yes, sir.

5          MR. SWINFORD:  And that I should be the one to address the

6     Court.

7          THE COURT:  Yes, sir.  There is no hybrid representation

8     at this time.  And you will -- as indicated, Counsel, you're

9     counsel for the defendant.  You can speak with him after we've

10    gone through this.  If there's anything else that you want to

11    add, I'll give you that opportunity.

12         MR. SWINFORD:  That's fine.  Basically, my only

13    response -- you hit the nail on the head when you said it was a

14    sentencing issue.  And that these arguments go towards the

15    sufficiency of evidence.

16         I would only ask the Court to also be cognizant and aware

17    of the series of texts from Walls-Land to Mr. Derringer after

18    they left the motel.  You know, I don't know if -- they weren't

19    really highlighted in any of the reports of the probation

20    office or of the -- because they weren't highlighted in that, I

21    didn't put them in objections.  But they are very damning,

22    actually, towards Walls-Land.  So I'll address some of those at

23    the conclusion.

24         THE COURT:  Yes, sir.

25         MR. SWINFORD:  The next paragraph is paragraph 8, this is

1    where I inadvertently called Special Agent Kimberly Kidd,

2    Kimberly Bradley.  She's another agent, I think maybe with the

3    Kentucky State Police, who does sexual cases.  And I apologize

4    to Ms. Kidd for giving her the wrong name.

5        But this talks about a text message from Walls-Land to --

6        THE COURT:  Mr. Derringer.

7        MR. SWINFORD:  -- Mr. Derringer.

8        THE COURT:  And the victim testified to the text message

9    but it was not on the phone at the time the phone was seized.

10       MR. SWINFORD:  Correct.  I only mention that because it,

11   in my mind, casts a big question mark on any and all of

12   Walls-Land's testimony.

13       THE COURT:  There is sufficient testimony presented

14   through the victim to include this specific information in

15   paragraph 8.  She described it in some detail, although it was

16   not described by Walls-Land, because at that point in the

17   examination of the witness, I believe there was an objection to

18   leading, and Walls-Land never got back to that point of

19   testifying to that issue.

20       But it does not prevent this particular paragraph from

21   being included in the presentence report.

22       MR. SWINFORD:  Yeah.  But I think, you know, my addition,

23   I don't see how that's argumentative.  I think it's more fact

24   related.

25       THE COURT:  Well, it relates to the issue that, as the

1   victim testified, that Walls-Land and Mr. Derringer were

2   effectively grooming the victim in the case to go back for --

3   to be sexually assaulted by the defendant.

4       Whether he already had a key to the room or a card key to

5   the room is not dispositive of that issue, but it does indicate

6   that Walls-Land and Derringer were working together to

7   accomplish that assault after they had returned to the hotel

8   room.

9       MR. SWINFORD:  The next paragraph that I revised was

10  numerical paragraph 17.  I think it's just a clarification of

11  the record and what actually happened.  And that is that,

12  initially -- and the Court's obviously aware of it because it's

13  seen the indictment and the superceding indictment -- the

14  United States itself initially believed that Walls-Land was the

15  one who was responsible for distribution.

16      THE COURT:  Yes.

17      MR. SWINFORD:  And because she decided to cooperate, to

18  help herself, they put Count 3 on my client.  This goes into my

19  argument later about the acquitted conduct.  And I just wanted

20  to give the Court a background of where I was coming from with

21  respect to the acquitted conduct.

22      THE COURT:  Yes, sir.  I certainly do understand your

23  argument.  But the Court has to make a factual determination as

24  to whether that acquitted conduct could be considered.

25      It's relevant conduct, and whether it could be considered

1    by a preponderance of the evidence is really the issue, because

2    we do have testimony in the case and other evidence that would

3    indicate that, after they were back at the hotel, the defendant

4    acquired the cell phone, had the cell phone in his possession,

5    this is Ms. Walls-Land's cell phone, and would have attempted

6    then to distribute through the Facebook Messenger to his own

7    phone.

8        And there's also an indication that he had possession of

9    the phone later at the residence.  It was located in the shed

10   where he had access to the shed with his other materials.  So

11   that's a factual issue of the parties.

12       MR. SWINFORD:  I acknowledge -- well, it's a factual

13   issue.  And I acknowledge that the Court has the discretion to

14   apply the acquitted conduct.  I'm not going to -- the law is

15   what it is on that, that's what the law is.

16       My argument would be that the Court should exercise its

17   discretion and not count the acquitted conduct.

18       THE COURT:  Right.

19       MR. SWINFORD:  I'm not going to tell you what the Court

20   can do, but as an advocate, I'm going to argue that you Court

21   shouldn't.

22       THE COURT:  Yes, sir, I understand.

23       MR. SWINFORD:  And then paragraph 19 is the unsworn

24   statement of Walls-Land.  This is before she attempted to

25   cooperate.  Did state that Derringer was not supposed to stay

1   at the hotel room.  And the argument -- this just is the

2   factual background to support my argument that he was not the

3   custodian.

4       THE COURT:  He was not a designated chaperone essentially.

5       MR. SWINFORD:  He's not a designated chaperone.  And

6   here's the important thing about that, and we'll get to it when

7   we get there, is that he was with them but -- and then he was

8   with the victim alone when he went -- and went to that FiveStar

9   and turned around and came back.

10      But when Walls-Land got in the car, that's the point, she

11   got in the van with them and she was the chaperone.  The

12   criminal activity occurred when Walls-Land was present, not

13   when he was going with her alone and went to the FiveStar and

14   turned around.

15       THE COURT:  Well, if we have a conspiracy to produce

16   visual depictions of minor, and there were text messages that

17   were being exchanged before he ever gets back to the hotel to

18   pick up Walls-Land, then there can be criminal conduct that's

19   occurring before the two them are together.

20       MR. SWINFORD:  I would acknowledge that, Your Honor, and

21   you said the important word, "conspiracy."

22      I have read the superceding indictment, I know what it

23   says.  You're very astute to point that out.  I have not had

24   much luck in explaining that concept to Mr. Derringer

25   heretofore, but I think you've touched on it so I understand.

1          Okay.   Those are the specific objections that I have with

2     respect to the texts.   I really don't think they are

3     argumentative and I don't think the United States and me are

4     that far apart with respect to the factual background of this.

5     I thought I was making it more clear.

6          THE COURT:  All right.   Thank you.

7          Let me go through some of these paragraphs --

8          MR. SWINFORD:   Okay.

9          THE COURT:   -- then I'll ask the U.S. to respond.

10         Specifically, there are a few corrections I would make to

11    the paragraphs that are the subject of the objections,

12    5 through 25.

13         First, in paragraph number 5, the assault actually

14    occurred on March 11th.   The third line down on paragraph 5

15    indicates that it was March 10th.   But then that's corrected in

16    paragraph 6, obviously, but the assault itself occurred on

17    March 11th.

18         There is sufficient factual information in the record to

19    confirm and to apply the enhancement for threats being made

20    both before and after the sexual assault.

21         Threat being made before the sexual assault was as

22    indicated in paragraph 6, that he threatened not only to force

23    her to smoke methamphetamine but also to rape the victim if she

24    didn't stop crying.

25         And then afterwards, that he would kill members of her

1   family if she reported the incident to anyone.  So there's both

2   threats being made both before and after, testified to by the

3   victim in the case, and then confirmed by Walls-Land both in

4   direct and as well as in cross-examination.

5       I do have a question and I do want the parties to address

6   the issue of sadomasochistic conduct and whether that's

7   actually depicted in the videos.  And as in the addendum to the

8   report, the probation officer cites the case of *United States*

9   *v. Corp*, which does indicate that the depiction must indicate

10  the conduct itself and not just testimony about that.  So I do

11  want the parties to address that particular issue.

12      Some of the information that is reflected in these

13  paragraphs is a summary based upon the probation officer's

14  review of the videos.  As I've indicated, I have reviewed these

15  particular videos and the information is substantially correct.

16      There are a few stray comments, such as paragraph 6(c),

17  about halfway down, "Derringer fully penetrates the victim's

18  vagina with his fingers."  There's no way to tell that from

19  looking at the videos themselves, although one could draw that

20  conclusion from the remaining description.

21      Toward the end of paragraph 6(c), "the victim continues to

22  try and fight."  I would probably describe that as resist as

23  opposed to fight, but that's a descriptive word that, in the

24  opinion of the probation officer, would be appropriate, but it

25  does not affect the guideline calculations based upon my

1    findings that the defendant made threats to the victim, again

2    both before and afterwards, if she did not comply.

3        Going over to page 7, paragraph 7, "Walls-Land stated that

4    she had gotten out of the van to vomit," and then there's a

5    parenthetical indicating it was because she was pregnant, but

6    that's contrary to the testimony.  She indicated that the

7    defendant's actions were making her sick -- codefendant's

8    actions were making her sick, not because she was pregnant,

9    although she was, that was not the reason for exiting the van.

10        Then there is the statement on paragraph 17, I do want the

11   parties to address.

12        MR. SWINFORD:  On where, Your Honor?

13        THE COURT:  Paragraph 17.

14        MR. SWINFORD:  Okay.

15        THE COURT:  This is an issue that you had raised about

16   whether there was sufficient evidence to find that the

17   defendant attempted to distribute the videos himself via

18   Facebook Messenger on March 11th, 2018.  There is certainly

19   quite a bit of evidence that would lead to that conclusion, but

20   I do want the parties to address that issue inasmuch as the

21   guidelines themselves define distribute to include attempt to

22   distribute, and we'll address that.  I do want the United

23   States to address it.

24        Those are some of the corrections I would note for the

25   record.

1          Ms. Melton, at this time if you could address those

2     specific issues, please.

3          MS. MELTON:  Yes, Your Honor.

4          Starting with paragraph 5, we agree that the assault

5     occurred on March 11th, 2018.  So that should be subject to an

6     objection.

7          The United States also agrees with the Court in terms of

8     the content of paragraph 6, the threats made towards the

9     victim, both before and after the assault, are supported by a

10    preponderance of the evidence.  And we believe that those are

11    sufficient for obstruction, although we may want to take up

12    that legal question later.

13         In terms of the sadistic and masochistic nature of the

14    videos, we know the age of this victim, she was 11 at the time

15    this incident occurred.  So pursuant to the guidelines, she is

16    considered prepubescent.  At various points through the videos,

17    there is movement indicative of penetration.  Based off of the

18    quality of the videos, I'm not sure that anybody can

19    definitively say, yes, I actually saw insertion of a finger

20    into a particular orifice.  But based off the direction of

21    where those fingers were heading and the fact that fingers

22    don't just disappear or shrink, they were moving into

23    something.  So we do believe the videos demonstrate sadistic

24    and masochistic conduct because the victim was 11 and there was

25    penetration.

1        THE COURT:  If this were penetration into the anus, it

2   would be a separate issue or stronger issue, wouldn't it?  With

3   regard to sadistic conduct, not whether it was a sexual

4   assault.

5        MS. MELTON:  Yes, Your Honor.  And I think it's also

6   difficult to say from the videos whether there was penetration

7   in one or the other.

8        THE COURT:  The reason I ask the question is that, at one

9   point Walls-Land gets out of the van, and then when she gets

10  back in, the defendant makes a statement about the victim's

11  preference.  But there's no video of that.  But then he tells

12  her he wants her to take that video.  And then we have video

13  clips 22 and 23, which are not that clear in terms of the

14  activity that's taking place.

15       MS. MELTON:  Video clips 22 and 23 would be consistent

16  with Walls-Land's statements, but I think, especially with the

17  size of this child and the fact that her vagina is probably

18  pretty close to her anus, it's impossible to tell where exactly

19  his fingers were going.  They are going into something, but I

20  don't think that I could fairly represent to the Court that I

21  knew which orifice they were going in.

22       Additionally, there is other evidence of violence and pain

23  contained within the videos that we believe separately supports

24  the enhancement for sadistic and masochistic conduct.

25       THE COURT:  This is the clenching of fists and the attempt

1   to stop the defendant?

2       MS. MELTON:  Correct, Your Honor.  Also the physical

3   restraint of the victim that's showed at various points

4   throughout the videos.

5       As for the other issue with 6(c), where it says "the

6   victim continues to try and fight Derringer," the United States

7   has no objection to "resist" being substituted in instead of

8   "fight."

9       In paragraph 7, the parenthetical about Walls-Land being

10  pregnant, Walls-Land was pregnant at the time, but the United

11  States agrees that Walls-Land did testify it was because she

12  was sort of disgusted with what she was observing and not

13  because she was pregnant.

14      On paragraph 17, I believe that was our next one.

15      THE COURT:  Yes.  This does relate to the enhancement.

16  The parties can argue about any legal issues, but this is the

17  factual basis for the enhancement for distribution.

18      MS. MELTON:  Correct, Your Honor.

19      That Derringer was the person who attempted to distribute

20  the videos, I believe is supported by a preponderance of the

21  evidence.  Walls-Land testified as to that fact.  It was only

22  the videos showing the explicit conduct that were attempted to

23  be sent.  And, of course, Mr. Derringer was the intended

24  recipient of those Facebook messages.

25      You know, in terms of their plan here and their joint

1    scheme, all the evidence points to this being done for

2    Mr. Derringer's sexual satisfaction.   Therefore, we believe it

3    was part of their joint scheme and it was certainly foreseeable

4    that those videos from Walls-Land's phone would be transferred

5    ultimately for Derringer so that he could, quote/unquote, enjoy

6    them.

7         We do believe that the guidelines' definition for

8    distribution supports attempts to distribute.   We also believe

9    that *United States versus Mudd* supports a broader definition of

10   distribution.

11        Did I miss anything?

12        THE COURT:   No, ma'am.   I think you addressed all of the

13   pertinent facts that would relate to some of the objections

14   that have been raised by the defendant.

15        All right.   The second objection relates to the defendant

16   objects to a motion for judgment of acquittal being overruled

17   as to Counts 1 and 2.

18        MR. SWINFORD:   Can I address those?

19        THE COURT:   Yes, sir, you may.   It doesn't affect the

20   guidelines, but you can address those.

21        MR. SWINFORD:   The ones that she did?

22        THE COURT:   I'm sorry?

23        MR. SWINFORD:   The ones we just went over?

24        THE COURT:   Oh, I'm sorry.   Yes, you may.

25        MR. SWINFORD:   Thank you, Your Honor.

1        I'm just going to hit on two of them because I agree with

2    Ms. Melton's statements regarding the revisions or minor

3    revisions that you have noted.

4        7, sadistic and masochistic conduct.  You know, I cited

5    two cases.  And one of them is *United States v. Corp*, and I

6    think the other is *United States v. Cover* or *Cover*.  And

7    basically the -- and this kind of highlights a problem I have

8    with the case, that it's really, you know, a sexual assault

9    case.  But that's the relevant conduct, as you correctly

10   pointed out several times during this hearing, that underlies

11   the child porn charges.

12       But in those cases, for the child porn charges, for

13   production, it has to be on the video.  And I think you

14   correctly pointed out, and Ms. Melton correctly pointed out,

15   that the videos were somewhat unclear.  That was the reason I

16   approached Ms. Melton, Mr. Marye and Ms. Kidd to have the

17   opportunity to look at the videos again, because I realized it

18   was a sentencing issue.

19       I had problems seeing the video at the trial.  It wasn't

20   at this table, but there was one monitor and I was on one side

21   and he was on the other side and we were kind of leaning.  And

22   of course the trial was going on and I was trying to watch the

23   jury, so I had a very difficult time seeing what actually was

24   depicted on the videos at the trial.

25       We met in the U.S. Attorney's Office with Ms. Kidd, who

1    brought a brand new computer, and it was a small conference

2    room, I think maybe the lights were dimmed, Ms. Cardin was

3    there, Mr. Gore was there, and all the people.  So we were able

4    to see better.

5        But, again, I have problems in seeing where his fingers

6    were and things.  Of course, that's what one or both of those

7    cases state, that you have to -- it has to be clear on the

8    video.

9        THE COURT:  With regard to the issue of sadomasochistic

10   conduct, that's my concern.  My concern is not with the other

11   videos.  The other videos clearly do depict the defendant

12   engaging in sexual assault on the victim.

13       MR. SWINFORD:  I agree with you.

14       THE COURT:  I don't have any problems at all telling

15   that's what was going on in those videos.  The only issue was

16   area of penetration that I have raised with counsel.  The rest

17   are clear what this defendant was doing and they would meet the

18   definition --

19       MR. SWINFORD:  I acknowledge --

20       THE COURT:  -- of Counts 1 and 2.

21       MR. SWINFORD:  I acknowledge the obvious, Your Honor, I

22   was there.  But he did get to view these videos, I believe, one

23   time.  Didn't Ms. Kidd show the videos to both of us at one

24   time?  I know she did, early in the case, very early in the

25   case, before I had my stroke.  So he has been able to see them.

1          Now, if I could skip to 17, because I don't dispute.

2          THE COURT:  Yes, sir.

3          MR. SWINFORD:  -- your statements in the other things.

4          This is about the distribution.

5          THE COURT:  Yes, sir.

6          MR. SWINFORD:  And, you know, as I have stated previously,

7     I'm not going to beat a dead horse.  Again, I acknowledge the

8     obvious.  You have the discretion to apply acquitted conduct.

9     And preponderance of the evidence is the standard at a

10    sentencing hearing, we all are aware of that.

11         I think in order to do that, you are going to have to

12    believe Walls-Land.  And maybe not.  You know, the United

13    States has argued that there's other -- but I think for a good

14    part, you have to believe Walls-Land.  I just don't think you

15    should do it.  And that's my argument there.

16         I'll sit down and be quiet.

17         THE COURT:  All right.  Thank you.

18         MS. MELTON:  Your Honor, may I briefly address the

19    sadistic/masochistic issue one more time?

20         THE COURT:  Yes, ma'am, you may.

21         MS. MELTON:  The videos absolutely show penetration.

22    Again, the United States stated that it's not clear from the

23    videos which orifice it's going in.

24         THE COURT:  Yes, ma'am.

25         MS. MELTON:  But we believe it shows penetration.  And I

1  don't think there's any requirement under the law that the

2  videos be, you know, as close up as they possibly can be or

3  that, you know, the defendant have a GoPro on his fingers or

4  anything like that.

5       THE COURT:  Right.

6       MS. MELTON:  All it requires is that the penetration be

7  shown on the video, and I think that these videos satisfy that

8  requirement.

9       THE COURT:  All right.  I understand the parties'

10 positions factually.  And some of these factual issues do

11 directly relate of the legal issues about the application of

12 certain guideline enhancements.

13      I'll make specific findings on each of these at the time I

14 address the guideline issues.

15      We were addressing Objection Number 2, this is the motion

16 for judgment of acquittal.  And I do understand it's a legal

17 issue that has been addressed previously.  It does not impact

18 the guidelines and does not require further ruling by the

19 Court.

20      Objection Number 3, the defendant objects to the

21 enhancement for obstruction of justice.  He denies the

22 statements that were attributed to him were ever made or that

23 D.M. misunderstood him.

24      I find that that objection is not well taken, that the

25 facts in the case after reviewing, again, the entire record of

1   the proceeding, and that would include the written testimony of

2   the victim in the case, is there was no misunderstanding that

3   this child was fearful based upon the threats that were made to

4   her, both before and afterwards by the defendant.

5       And there is support to confirm the threats were made both

6   during the direct as well as the cross-examination of the

7   codefendant, Walls-Land.  And I do find that the enhancement,

8   therefore, is properly applied for obstruction of justice.

9       Objection Number 4 is the defendant denies that he engaged

10  in the distribution of child pornography, and therefore should

11  not receive a two-level increase under 2G2.1(b)(3).  That is

12  the objection on acquitted conduct.

13      Let me turn to 2G2.1(b)(3).  I will point out Application

14  Note 1 defines distribution as any act, including possession,

15  with the intent to distribute, production, transmission,

16  advertisement, and transportation relating to the transfer of

17  material involving the sexual exploitation of a minor.  So

18  again, it would include attempted distribution.

19      The factual issue here comes down to whether the person

20  that attempted to transmit the images was either Mr. Derringer

21  or Ms. Walls-Land.  This was the attempt to distribute the

22  images using Facebook Messenger from her phone, where the

23  videos were taken, to his phone.

24      Ms. Walls-Land specifically denied that she attempted to

25  do that.  An inference may be drawn, based upon all the factual

1   information provided, both before as well as afterwards, that

2   it was the defendant that was attempting to do this, based upon

3   his desire to obtain child pornography through the various text

4   messages and also through the testimony of Walls-Land.

5       The defendant takes the position that the United States

6   originally indicted Walls-Land for the attempted distribution,

7   but later, in an attempt to get her cooperation, filed a

8   superceding indictment which the defendant was charged with

9   attempted distribution as opposed to Walls-Land.

10      And then at trial, the jury acquitted this defendant of

11  that particular charge.  He acknowledges that the Court may

12  consider acquitted conduct that is relevant conduct under

13  1B1.3, so the question becomes whether there would be

14  sufficient evidence by a preponderance of the evidence to find

15  that this defendant engaged in attempting to distribute child

16  pornography.

17      So I think I've laid the factual predicate for each side

18  so I'll hear from the parties at this time.  Inasmuch as this

19  would be an enhancement to the guidelines, the United States

20  would have the burden of proof.

21      Ms. Melton, did I miss anything in terms of the proof

22  presented during trial?

23      MS. MELTON:  No, Your Honor.

24      THE COURT:  All right.  And the United States' position is

25  simply that, that it fits the definition under the guideline

1  section; is that correct?

2      MS. MELTON:  Yes, Your Honor.  We believe that it

3  satisfies 1B1.3, in terms of both the preponderance of the

4  evidence supporting that Mr. Derringer did it, but also under

5  1B1.3, relevant conduct can include the acts of others.

6      So assuming that Walls-Land did attempt to distribute it

7  herself, we believe that those acts that she undertook were

8  part of the jointly undertaken criminal activity that can also

9  be considered by the Court.

10     THE COURT:  Thank you.

11     Mr. Swinford.

12     MR. SWINFORD:  Your Honor, obviously I have a much tougher

13  issue to overcome with respect to the joint acts, the

14  conspiracy.  I'm aware of that.

15     His position has been all along that he was not aware that

16  she was filming and did not know it was on her phone and

17  obviously wouldn't have gotten it and sent it.

18     Having said that, the jury convicted him of the

19  production, so I think in good faith I can tell you his

20  position, but I'm aware of what happened at the trial.  I was

21  there.  So they convicted him.  So I have a much tougher issue

22  with the conspiracy part.

23     With the other part, I don't think that he did do it.  The

24  jury didn't believe he did it.  One of the things -- there's

25  kind of a cop-out that the United States says that, you know,

1   well, we didn't carry our burden of proof on that issue,

2   doesn't mean that, you know, he didn't do it.  I'm not talking

3   about the preponderance of the evidence standard here.  I'm

4   talking about the trial.

5        Well, I can likewise say I didn't convince the jury of the

6   burden of proof on Counts 1, 2 and 4.  I didn't contest

7   Count 5.  You know, you haven't heard me today, and you didn't

8   hear me at the trial -- if you read the whole transcript and

9   read -- I don't think closing statements were in there --

10       THE COURT:  Ironically, based on the guideline calculation

11  in Count 5, even if you win on all your objections on 1, 2 and

12  4, Count 5 is going to end up in a life range in excess of a

13  base offense level of 43.

14       MR. SWINFORD:  I'm glad you pointed that out, Your Honor.

15  I have known that all along.  I've wondered kind of why we went

16  down this road, the United States and I did.  I have wondered

17  that.  But --

18       THE COURT:  Well, here's the impact of it.  With a life

19  range -- if you're in a base offense level 43, criminal history

20  category VI, that's as high as it goes.

21       MR. SWINFORD:  I understand.

22       THE COURT:  And he's convicted on four counts.  First

23  count carries 30 years.  Second count carries 30 years.  The

24  fourth count carries 20 years.  The fifth count carries

25  20 years.

1          So if he is convicted on 5 and not the others, he's maxed

2     out at 20.   If he's convicted on four, his range is 1,200

3     months, effectively a life sentence, that's a hundred years.

4          MR. SWINFORD:   I understand that, Your Honor.   I've been

5     battling -- I'm going to address that issue at the appropriate

6     time under the statute.

7          THE COURT:   All right.   With regard to this particular

8     issue of distribution, any other issues to be raised on this?

9          MR. SWINFORD:   On the distribution?

10         THE COURT:   Yes, sir.

11         MR. SWINFORD:   No, Your Honor.   Other than I'm just going

12    to ask the Court to use its discretion and not apply that

13    enhancement.   I understand the Court can --

14         THE COURT:   All right.

15         MR. SWINFORD:   -- based on the issue of Jackie

16    Walls-Land's credibility.

17         THE COURT:   All right.

18         Objection Number 5 relates to the four-level increase,

19    this is on the sadomasochistic conduct.   I think we've

20    discussed this at length, if the parties wish to further

21    address it, you may do so.

22         In part, the United States indicates that because of the

23    age of the victim, does not have to be established that she was

24    prepubescent.   The defendant takes the position she had

25    reached -- she had reached puberty, and therefore some of the

1    case authority should not apply to her.

2         We've discussed at length some of the cases, including

3    *United States v. Corp*, which is cited in the addendum to the

4    report, it's a case from 668 F.3d, 379, it's a decision by

5    Judge Moore, Karen Nelson Moore.

6         Any other arguments that the parties wish to make as to

7    that objection?

8         MR. SWINFORD:  No, Your Honor.  I'll stand on my previous

9    arguments.

10        THE COURT:  All right.

11        MS. MELTON:  Same for the United States, Your Honor.

12        THE COURT:  And Objection Number 6, Ms. Melton, the

13   defendant does appear to have a fairly strong argument on this

14   particular objection.  This is the two-level objection

15   asserting that he should not be considered as being in the

16   care -- I'm sorry, the minor was not in his care, custody or

17   supervision at the time of the offense.

18        The facts would tend to indicate that it was originally

19   not planned for Mr. Derringer to be at the motel for this

20   sleepover.  He decided he wanted to be there, and I think it's

21   for obvious reasons as reflected in all the testimony in the

22   case why he wanted to be there.

23        But the victim's mother was never told it would be

24   Mr. Derringer, it was always Walls-Land that was going to be

25   the person supervising the children.

1        Should the enhancement be applied under those

2   circumstances?

3        MS. MELTON:   Yes, Your Honor, we believe that it should.

4   The primary reason for that is because there doesn't just --

5   there's no rule that there's only one caretaker.   There can be

6   joint caretakers.   And Mr. Derringer did avail himself to being

7   one of two adults there at that slumber party that evening.   He

8   even signed the paperwork for the hotel room.

9        So in doing that, he took on custody, care and supervision

10  of the room, of the kids in the room.   And especially when he

11  offered to drive the victim home.   To the extent there was some

12  sort of rule that we can only have one caretaker, at that time

13  he assumed the role of sole caretaker.

14       You know, I hope that D.M. doesn't get offended by me

15  saying this, but in a way I sort of think about property law.

16  You know, you allow somebody to have custody, care and control

17  over your property, and then that person maybe entrusts it to

18  somebody else.   That doesn't mean that, you know, this last

19  person in the chain doesn't have custody, care and control over

20  that piece of property.

21       And so we believe that throughout the evening,

22  Mr. Derringer had custody, care and supervision over D.M., but

23  certainly in the van that evening.

24       MR. SWINFORD:   Your Honor, I'm not going to belabor a

25  point I think I've made throughout.   But I will state that the

1    issue is who was -- I'll acknowledge that the "in care of" is

2    to be interpreted broadly according to the application notes

3    and the case law.  I understand that.

4         But I think you need to focus on when the sexual assault

5    occurred, when this criminal activity occurred.  It occurred in

6    the van when Jacquolyn Walls-Land was there.  And if you read

7    that transcript -- and I'm sure you said, you said you did, you

8    said you read everything -- but if you read that transcript of

9    the victim, she states several times in that transcript, "I

10   wondered when Jackie was going to do something," "was going to

11   step in."

12        THE COURT:  Right.

13        MR. SWINFORD:  She was looking for Jackie to step in and

14   stop this assault.  And Jackie never did.

15        THE COURT:  Because of the parties' agreement, she did

16   not.  Because of the conspiracy, she did not.

17        MR. SWINFORD:  I'm not going to dispute that statement

18   that you made, Your Honor.  You're right, because the jury

19   convicted him of that.  You are right.  But she looked to

20   Jackie.  She testified, you know, "When was Jackie going to do

21   something?"  And she didn't.  You've got a tough job the next

22   hearing.

23        THE COURT:  All right.  Thank you.

24        I will make findings that relate to the guideline

25   applications in this particular case.  Some of these findings

1   relate to multiple paragraphs, because Counts 1, 2 and 4 apply

2   the same enhancements based upon similar conduct.

3          So I'll go through the objections.

4          I'll just note for the record, first, that it would be

5   very easy for the Court to say preponderance of the evidence,

6   and I find this by a preponderance.

7          I make these findings by clear and convincing evidence in

8   this particular matter, and I do so not having participated in

9   the trial, but having reviewed all the materials, including the

10  transcripts, and having read the transcripts on a couple of

11  occasions.  I think they're in excess of 400 pages, or

12  thereabouts, and also having reviewed the exhibits that were

13  admitted during the course of the trial.

14         And sometimes the Court considers -- it can't make

15  credibility determinations but it can make decisions according

16  to evidence that's supported by other testimony and documentary

17  evidence.  For example, the objections and the arguments that

18  have been made about the credibility of Walls-Land.

19         The problem with some of the arguments would be that her

20  testimony was supported by other evidence presented during the

21  course of the trial that would be consistent, and it would be

22  inconsistent to find otherwise.

23         Now, with regard to the first objection, relates to the

24  factual information in the report.  I have indicated some

25  disagreement with paragraphs 5 through 25 based upon my review

1   of the evidence in the case.  And those factual differences do

2   not affect the guideline calculations, except as I'll indicate

3   here in just a moment.

4       Objection Number 2 does not affect the guidelines, that

5   relates to the Court overruling the motion for judgment of

6   acquittal.

7       I made findings with regard to Objection Number 3, which

8   is the enhancement for obstruction of justice as set forth in

9   paragraph 39.  Specifically, I have found that the defendant

10  made threats to the victim, both before and after the assault

11  in issue.

12      I'll reiterate.  The threats before were that the victim

13  would either follow his demands or that -- that is she would

14  smoke methamphetamine, or she would both smoke methamphetamine

15  and she would be raped.  And the defendant then complied with

16  the defendant's demands.  He then assaulted her not by raping

17  her, but by engaging in conduct that does meet the definition

18  of sexual assault.

19      So I do find that the objection is -- will be overruled,

20  Objection Number 3.

21      Objection Number 4 will also be overruled.  That is the

22  defendant denies that he engaged in the distribution of child

23  pornography and should not receive the enhancement.

24      His position, again, is that the Court should consider the

25  testimony of Walls-Land with caution for the reasons that I

1    have outlined.  But I conclude by clear and convincing evidence

2    that all the evidence would indicate that this defendant did

3    attempt to distribute these images to himself through Facebook

4    Messenger.

5         He had access to Walls-Land's cell phone following the

6    assaultive conduct.  Had the opportunity both while he was in

7    the hotel, and the record does indicate that there was some

8    problem with checking out on time, he would have had access to

9    the phone at that point and would have also had access to it

10   later.  So he had possession and access to the cell phone,

11   which supports not only the possession but also the attempted

12   distribution.

13        And the Court acknowledges that he was acquitted of that

14   conduct, but the Court may consider all relevant conduct under

15   1B1.3, and it does point toward the defendant being the person

16   who attempted to distribute it to himself.

17        That would include the testimony of Walls-Land, which

18   indicated that the defendant, prior to the sexual assault, had

19   problems engaging in sexual activity with her and, instead, was

20   looking for child pornography and was looking to do that, and,

21   in fact, created that type of depictions for his own

22   self-gratification.

23        So I do find that there is clear and convincing evidence

24   that support the enhancement being applied.  So the objection,

25   again, will be overruled, Objection Number 4.

1    Objection Number 5 is a close question.  It is the

2  objection relating to sadomasochistic conduct.  And for the

3  reasons that are outlined in the decision in *United States v.*

4  *Corp*, the Court will sustain the objection to this objection,

5  the four-level increase.

6    As Judge Moore noted in that particular case, *U.S. v.*

7  *Corp*, the video must portray the conduct, the enhancement, the

8  sadomasochistic conduct.  In reviewing all of the video clips 1

9  through 23, I don't find that there would be sufficient

10  evidence to conclude that it was sadistic or masochistic.

11    The case did not involve a rape.  It involved insertion of

12  one or more fingers into the genital area and it's difficult

13  for the Court to determine in what particular area.  And,

14  specifically, when there is testimony from Walls-Land about

15  getting out of the van, the defendant describes conduct while

16  she was out of the van and asked her to take better videos or

17  take videos of that conduct when she returns to videoing the

18  activity.

19    But in video clips 22 and 23, you can't determine what's

20  actually happening.  It does not appear that the victim is

21  moving at that point.

22    Again, it is a close question.  And inasmuch as the United

23  States has the burden of proof, and inasmuch as the Court is

24  quite frankly applying a higher burden than a preponderance for

25  these particular objections, I will sustain Objection Number 5.

1    Likewise, I will sustain Objection Number 6, which relates

2 to paragraph 36 and other paragraphs of the presentence report

3 based upon the caretaking functions.

4    It does appear that this defendant placed himself in the

5 position to drive the defendant home, but there was no

6 indication before she became homesick that he was intending to

7 assault her, intending to assault this particular victim.   It

8 would appear to be more fortuitous than planned.

9    But there is ample evidence that the parties did agree

10 that the assault would take place, that Ms. Walls-Land and

11 Mr. Derringer agreed that the assault would take place before

12 he returned back to the hotel to pick up Walls-Land.   They were

13 in agreement that there would be videoing of the incident

14 which, according to what Ms. Walls-Land said, was intended to

15 gratify the defendant.

16    So we will sustain those two objections and overrule the

17 objections to the other areas of the presentence report.

18    Turning to the guideline calculations.   I will first adopt

19 the findings that are contained in the report to the extent

20 that they're not contrary to the findings I've just made, but I

21 will also adopt the oral findings that relate to the specific

22 objections.

23    In turning to the offense level calculations, the 2018

24 Edition of the Guideline Manual has been used.   I have

25 sustained two objections.

1          Base offense level is level 32.  There is a four-level

2   increase because the offense involved a minor who had not

3   attained the age of 12.

4          There's an additional four-level increase because the

5   offense involved the commission of a sexual act.  And the

6   conduct is described in Title 18, Section 2241, that is the use

7   of force in the administration of methamphetamine to the minor

8   without her permission.

9          I have also found that the defendant knowingly engaged in

10  distribution, so that's another two-level increase; and the

11  obstruction of justice increase, which is two levels.

12         That has the effect of creating an adjusted offense level

13  of 44.

14         For Count 2, the same objections have been raised and the

15  Court's ruling would be the same.  And the effect would be the

16  same, and that would be to reduce the adjusted offense level to

17  a level 44.

18         And in Count 4, again, the Court's ruling would be the

19  same with regard to those objections.  That would have the

20  effect of creating an adjusted offense level of 44.

21         It's not the case for Count 5.  For Count 5, the guideline

22  range would be set forth in 2D1.1 of the guidelines.  The

23  section provides that if the defendant is convicted under those

24  statutory sections of Title 21, and the offense of conviction

25  establishes that death or serious bodily injury resulted from

1    the use of the substance, the base offense level is 38.

2        When we look at the definition of serious bodily injury, I

3    do want to give the parties an opportunity to address this

4    issue, although it's not subject of a specific objection.

5        But when we look at the definition of serious bodily

6    injury in Section 1B1.1, the Application Note M, serious bodily

7    injury is deemed to have occurred if the offense involved

8    conduct constituting criminal sexual abuse under Title 18,

9    Section 2241 or 2242, or any similar offense under state law.

10       And then when we cross reference those sections, this

11   defendant's conduct would meet those definitions and would

12   therefore constitute serious bodily injury and would result in

13   a base offense level of 38.

14       Likewise, there's a two-level increase if the defendant

15   used violence, made a credible threat to use violence or

16   directed the use of violence.  That did occur in this

17   particular case for the reasons previously stated.

18       There's also a two-level increase if the defendant knew or

19   should have known that the victim of the offense was a

20   vulnerable victim.  In this particular case, there is an

21   abundant amount of evidence that does establish that the victim

22   was a vulnerable victim because of her age.  And the defendant

23   was certainly aware of that fact, of her young age, and

24   selected her in part for that reason.  And therefore the

25   two-level increase would be properly applied, as would be the

1   adjustment for obstruction of justice, which would include the

2   defendant's threats to the victim that he would cause harm to

3   her and/or her family if she disclosed his assault upon her.

4   So that would also result in an adjusted offense level of 44.

5          I do want to give the parties the opportunity to address

6   this particular section inasmuch as I raised it earlier.

7          But that would have the effect of creating, again, an

8   adjusted offense level of 44.  The maximum offense under the

9   guidelines is 43.  But that would be Court's initial finding as

10  to Count 5.

11         The parties wish to address Count 5, Ms. Melton?

12         MS. MELTON:  Your Honor, we agree with the Court's

13  recitation earlier on the base offense level being 38 based off

14  of serious bodily injury occurring under 2D1.1.

15         Of course, 2D1.1 requires us to go look at the definition

16  section contained in 1B1.1.  We see there that serious bodily

17  injury is deemed to have occurred if criminal sexual abuse or

18  any other similar offense occurred under 2241 or 2242.

19         Of course, 2241 is aggravated sexual abuse, and 2242 is

20  sexual abuse.

21         It's clear from the videos and the testimony of D.M. and

22  Ms. Walls-Land that sexual abuse did occur here.  We believe

23  that serious bodily injury enhancement is appropriate.

24         THE COURT:  Thank you.

25         Mr. Swinford.

1          MR. SWINFORD:  Your Honor, I'm aware of -- or I

2    acknowledge what the Court has stated.  I have nothing to

3    disagree with that.  I'm trying to be cognizant and not use the

4    victim's name, so --

5          THE COURT:  Yes, sir, I understand.

6          MR. SWINFORD:  -- I'll leave that out.  But it appears to

7    be -- the probation officer's recitation in the report appears

8    to be correct.

9          THE COURT:  All right.

10         MR. SWINFORD:  We did not offer any defense to that

11   charge, Count 5.

12         THE COURT:  Yes, sir.  All right.

13         Again, the Court will adopt the guideline calculations

14   that I have just reviewed.  They create a total offense level

15   of 43.

16         Information regarding the defendant's criminal history is

17   contained in the report.  Beginning at the bottom of page 15,

18   part B outlines juvenile adjudications for which the defendant

19   does not receive any criminal history points.  And also does

20   not receive criminal history points for a number of offenses,

21   older convictions.

22         First conviction that he does receive points would be

23   reflected in paragraph 84.  He receives two points for that

24   conviction.

25         And then continuing on through the report, the defendant

1   has a total of 24 criminal history points that would place him

2   in criminal history category VI for purposes of calculating his

3   guideline range in the case.

4        I believe earlier during the portion of the hearing

5   dealing with the attempt to change counsel, I indicated that it

6   takes 10 or more points to get into criminal history

7   category VI, it actually takes 13 or more points, but the

8   defendant is well into criminal history category VI with

9   24 criminal history points.

10       The statutory provisions are outlined for the term of

11   incarceration in paragraph 131.

12       The guideline range in this particular case is reflected

13   in paragraph 132.  Total offense level of 43 and criminal

14   history category VI places the defendant in a range of life

15   imprisonment.

16       There is statutory maximums, however, for each of these

17   counts.  For Counts 1 and 2, it's 360 months.  For Counts 4

18   and 5, it's 240 months for each of those counts.

19       Terms of supervision are properly set forth, both

20   statutorily and under the guidelines, in paragraphs 134

21   and 135.

22       The fine range in the case is set forth in paragraph 141,

23   and that is a range of $50,000 on the low end to $1 million on

24   the upper end.

25       Finally, I understand there is not a request for

1   restitution by the victim in the case.  Is that correct,

2   Ms. Melton?

3        MS. MELTON:  That's still correct, Your Honor.

4        THE COURT:  So there's no issue of restitution to be

5   determined by the Court.

6        I have addressed all of the objections.  I have gone

7   through the guideline calculations with the parties.  Also, I

8   told Mr. Swinford if he needed additional time to consult with

9   Mr. Derringer on any other issues before we proceed with

10  allocution, I would give him that opportunity.

11       MR. SWINFORD:  Thank you, Your Honor.

12       (Defendant consulting with counsel.)

13       MR. SWINFORD:  Your Honor, we are ready to proceed.

14       THE COURT:  We will proceed with allocution.  I will turn

15  to Mr. Swinford first, I'll give Mr. Derringer an opportunity

16  to address the Court, then I'll turn to the United States.

17       I have reviewed the victim statement.  But if there is

18  further statements to be made on her behalf, either you may do

19  so or any other individual on her behalf may do so.  I'll give

20  Mr. Swinford a chance to respond.

21       MR. SWINFORD:  Thank you, Your Honor.  May I stand?

22       THE COURT:  Yes, sir.  That's fine.

23       MR. SWINFORD:  This is a very hard case for me personally

24  and for my client.  I will say that the biggest problem and the

25  issue that Mr. Derringer and I have had throughout is that,

1    especially after the jury verdict, it was obvious that he was

2    going to serve and should serve some significant time in

3    prison.  What he's convicted of is a horrible crime.

4        I get there differently than the United States gets there,

5    though, because I have some real issues with their theory of

6    the case.  But, ultimately, we both arrive at a significant

7    sentence.

8        This is not your typical child porn case.  Since you read

9    the transcript, you are aware that the victim stated at the

10   outset of her testimony at the trial that this was a sexual

11   assault case.  And the United States testified, in questioning

12   the victim, that it was a sexual assault case.

13       THE COURT:  Well, it was to her.

14       MR. SWINFORD:  It was to her.

15       THE COURT:  That doesn't prevent it from being a federal

16   offense or several federal offenses.

17       MR. SWINFORD:  I understand.  I understand.

18       THE COURT:  Right.

19       MR. SWINFORD:  But it was a sexual assault case.

20       His problem and frustration with the case is that it

21   should have been prosecuted in a state court.  You have already

22   addressed that.

23       THE COURT:  Well, in part.  But, quite frankly, had I been

24   the trial judge in the case, I would not have allowed that

25   evidence to come in because it would not have been relevant,

1    and that is the evidence of the indictment that was dismissed

2    in the Boyle Circuit Court.

3         MR. SWINFORD:  I understand.

4         THE COURT:  I know Judge Hood allowed it, but he allowed

5    it and it benefited your client in terms of being able to argue

6    that fact.  To me that would not have been relevant,

7    necessarily.

8         MR. SWINFORD:  Didn't have much else.

9         THE COURT:  Understand.

10        MR. SWINFORD:  But I will state this.  And I don't think

11   the record in this case, until today, this has ever come out,

12   and that is we did have our differences, but every time we met,

13   Mr. Derringer expressed remorse at the start of what he did to

14   the victim.

15        He cried.  I think you're going to hear from him today.

16   He showed a lot of emotion.  That has not come out heretofore

17   at all.  And then after that -- and I think they were serious

18   tears.  I think I'm a pretty good judge of that.  Then he

19   started arguing about everything under the sun, as was

20   exemplified by the hearing before this sentencing hearing.

21        We have problems with the acquitted conduct which you have

22   assessed to him.  But you've already stated that, I'm not going

23   to go into all that at this stage.

24        He has expressed remorse to me on every occasion, I expect

25   you will hear from him today about remorse he has with respect

1   to this case.

2       You did not mention in your recitation of the presentence

3   investigation report, and I just want to make sure you did see

4   it, I feel certain you did, and that's paragraph 123(a) that

5   was added in the addendum by the probation office.  That is the

6   records from Lake Hills Oasis Drug Rehabilitation Center in

7   Somerset.

8       Mr. Derringer has a horrible drug problem.  And it's

9   stated in that paragraph that he was in that facility for

10  treatment.  He's been in and out of rehab facilities

11  frequently.  And the Court is aware of the letter that his

12  mother sent, which I have filed of record and your clerk was

13  kind enough to give me the original today that she sent to you,

14  but I had already filed it in the record, where she mentions

15  about his horrible drug problem.

16      Mr. Derringer, I'm not going to argue, but Mr. Derringer

17  maintains that it was Jackie who brought the drugs, the meth

18  that day to the car -- the van.  Whoever brought them doesn't

19  matter at this stage.  Mr. Derringer ingested the drugs,

20  forcibly gave the drugs to the victim and, you know, he was in

21  an altered state.  But that does not, you know, excuse his

22  conduct.

23      That was one of the issues he kind of mentioned briefly

24  today during the prehearing before the sentencing hearing.

25  That was explored.  It's not a defense to this type of

1  activity.  So it was not pursued, but it's an explanation of

2  what happened.

3      So he does have a significant drug problem.  I would ask

4  the Court, when the Court sentences him, to recommend that he

5  be enrolled in a drug program.  He's going to be in prison for

6  a long time.  Frankly, I doubt whether he would ever get any

7  credit off of the sentence, if you allowed and give him the

8  RDAP program, which I doubt he could, or any drug program, but

9  it would help him.  It's obvious that it would help him.  I

10  would ask the Court to recommend that he go into a drug

11  program.

12      Again, the United States initially believed that Jackie

13  was charged with distribution but changed it to him.

14      The history of the defendant.  First, the family values is

15  horrible.  He was -- his parents were divorced at a young age.

16  He was sent to live with his father and sexually abused, as was

17  reported in the report, by his stepmother.

18      So his criminal history is lengthy, as the Court pointed

19  out, as I pointed out in my sentencing memorandum that I filed,

20  but there's nothing in that criminal history which would

21  indicate that he would undertake some criminal activity such as

22  this.

23      It's a lengthy criminal history and it merits a criminal

24  history category of VI, which merits a lengthy sentence,

25  obviously.  But there's nothing that would indicate that he was

1    going to go out and commit a sex crime against a minor until

2    these text messages and this meeting with Jackie occurred.  You

3    wonder if it's something that, together, they -- it was a

4    conspiracy so they did them together.  Whether, if he had ever

5    met Jackie, if he would have taken that type of action.  We'll

6    never know.

7        But I guess the main thing I would tell the Court and the

8    sentence I would ask for, and he asks for a sentence of

9    25 years -- or asked me to ask for that.  I'm not.  I'm going

10   to beg the Court to sentence him to the statutory maximum of

11   30 years and not run them consecutive.  I'm aware the Court has

12   that discretion, but I would ask the Court not to run them

13   consecutive.

14       I think when you hear from him, if he is able to explain

15   to you his remorse and his sorrow for these actions.  He has

16   never, as he stated to you in the prehearing before today, he's

17   never denied that he sexually assaulted and sexually abused the

18   victim.  And he knows what he did is horrendous.  He also knows

19   what type of sentences the state court judges mete out.

20       And this is where he and I have a big difference, you

21   know, because I'm not going to disagree with the federal

22   sentences for child porn cases.  I may be a defense attorney,

23   but I understand why they are there.  You know, child porn

24   basically is the murder of your senses.  Your country cannot

25   survive if you don't punish these offenders.  It can't survive.

1   They don't do it that way in the state court.

2      And, you know, lay people like Mr. Derringer have an issue

3 with that.  They don't understand.  I understand, I know you

4 understand.  And I know she understands, because she prosecutes

5 it.  But, you know, he struggles with that.

6      But I think a sentence of 30 years in this case would meet

7 the statutory factors set forth in 3553 regarding the --

8 reflect the seriousness of the offense, because this is a very

9 serious offense.  I read the victim's impact statement.  It's

10 got tears on it, my copy does.

11      And, you know, to promote respect for the law.

12      I know you're going to sentence him to a lengthy sentence,

13 but I think 30 years does it.  He's 47 years old.  He's in poor

14 health.  He is almost blind.  He wears sunglasses inside all

15 the time.  He's got reading glasses.

16      I even filed something with the Court so you wouldn't

17 throw the book at him when he came in with sunglasses on.  And

18 so his health is poor.  I question whether he would survive a

19 sentence of 30 years.

20      But I do think that a 30-year sentence is a just

21 punishment in this case.  And I'm kind of coming to you hat in

22 hand begging for that, because I know what sentence you could

23 give him in your discretion.  I believe 30 years would be a

24 fair and sufficient sentence in this case.

25      Thank you.

1      THE COURT:  Thank you, Mr. Swinford.

2      Mr. Derringer, would you like to make a statement at this

3  time?

4      THE DEFENDANT:  First, I want to -- I hate to be calling

5  her the victim, like she's not a person.  But I don't want to

6  say anything out of disrespect either.  But I just want to

7  apologize.  And that she didn't deserve -- she didn't deserve

8  what happened.

9      Like I said, the text messages everybody keeps talking

10  about.  I was going to take her home and be right back.  That's

11  what I had full intentions of.  That's what I've said before.

12  That's exactly what I meant.  The text message was what I

13  meant.  I was going to just give that girl a ride home and be

14  right back.

15      And Jackie just said something about hit record because

16  that was the -- it was totally different.  So I went back that

17  day and asked her where -- the dope and all them came in and it

18  was a bad deal from there.

19      And the girl didn't deserve when she got.  And I don't

20  know what to else to say, other than I'm sorry, Judge.  I don't

21  know.  Tell her I'm sorry.  I apologize.

22      THE COURT:  Thank you.

23      Ms. Melton.

24      MS. MELTON:  Your Honor, may I use the podium?

25      THE COURT:  Yes, ma'am, certainly.

1          MS. MELTON:  Before I get started, I will ask the Court,

2    Your Honor, Mr. Derringer and I seem to agree on one thing and

3    that is the protocol for referring to the victim in this case.

4    I understand that her name doesn't need to be in the record,

5    but I do feel mighty awkward calling her not by her name when

6    she's present in the courtroom today.

7          Would it be okay if I call her by her name?

8          THE COURT:  No, I would prefer that you did not do that.

9          MS. MELTON:  I'll try my very best.

10         THE COURT:  Yes, ma'am.

11         MS. MELTON:  In Mr. Derringer's objections to the

12   presentence report in his sentencing memorandum and here today,

13   we've heard a lot of minimization of the conduct that he

14   engaged in.

15         We keep hearing that this is sexual assault case, plain

16   and simple.  But we're here in federal court because

17   Mr. Derringer primarily coerced a minor to engage in sexually

18   explicit conduct for the purpose of creating a visual depiction

19   of that conduct.  Coercing a minor to engage in sexually

20   explicit conduct is sexual assault.  So, yes, Mr. Derringer did

21   sexually assault the victim here, but he also produced child

22   porn.

23         THE COURT:  There's nothing to prevent the state court

24   from prosecuting him even now for that conduct, correct?

25         MS. MELTON:  Correct, Your Honor, as far as I know.  They

1  are a different sovereign, so jeopardy doesn't attach to this

2  proceeding.

3      THE COURT:  I know there is an order of dismissal without

4  prejudice in that case, it was introduced during the trial.

5  But the point is, yes, it was a sexual assault for which he may

6  be prosecuted in state court; but there were also several

7  federal offenses that were committed in the course of the

8  sexual assault.

9      MS. MELTON:  Correct, Your Honor.

10     Today, Mr. Derringer has told us that he didn't set out to

11  do this.  However, I do submit to the Court that the evidence

12  does not support Mr. Derringer's statements about that.  This

13  act did seem to be premeditated.

14     The victim stayed the night over with Walls-Land and with

15  Richard Derringer actually even the night before the sleepover,

16  and the victim testified at trial that Mr. Derringer had paid a

17  lot of attention to her and had even video recorded her prior

18  to this incident occurring.

19     Some of the photographs that we saw at trial showed the

20  victim, you know, laying on the bed, watching TV.  And those

21  photographs seem to be taken by Mr. Derringer.  So he was

22  paying a lot of attention to her before this incident.  And

23  certainly the text messages between Walls-Land and

24  Mr. Derringer seemed to indicate that there was a lot of

25  premeditation here.

1      So on that night of March 11th, even though the victim

2   should have had a normal slumber party, not unlike those that

3   most of us in this room experienced, she got homesick.  And

4   when she did, this defendant and his codefendant had nefarious

5   plans for her.

6      Mr. Derringer represented to the victim that he was going

7   to take her home, but instead he took her out into the middle

8   of nowhere, forced her to smoke meth, sexually abused her, and

9   he asked his codefendant to record that abuse.

10     When Mr. Derringer did that, he robbed the victim.  He

11  robbed her of her autonomy to choose her first sexual

12  experience at a time and a place when she was ready.  And

13  because of Mr. Derringer, her first sexual experience is always

14  going to be marked and intertwined with terror and violence.

15     And through this case, I have gotten to know this victim.

16  And she is a remarkable young lady, and in a lot of ways she is

17  the picture of resilience.  But it's going to take her a long

18  time to heal those wounds.  And this case demonstrates the

19  wounds that sexual abuse can inflict and how hard it is to heal

20  those things.  Because Mr. Derringer and his codefendant were

21  both sexually abused as kids.  I don't think that's a

22  coincidence.

23     But, fortunately, the victim here is on the path to

24  healing herself and she knows that that needs to be a priority.

25  But she's got some extra wounds that may not be readily

1   apparent to those of us who haven't experienced what she's

2   experienced.

3        In addition to wrangling with this sort of misplaced shame

4   and humiliation that a lot of survivors feel, the victim has to

5   wrangle with the fact that her powerlessness during those four

6   hours during her abuse was captured on film.

7        And she's been a trooper through all of this.  She's

8   always wanted to see justice brought here so she's not pushed

9   back on us in cooperating with this process at all.  But I know

10   for a fact that it's been hard for her to have those videos,

11   showing her complete vulnerability -- and just think about how

12   modest we all were when we were her age.  I mean, just

13   completely embarrassed about ourselves.  And then you've got

14   the abuse on the video on top of that.  Complete strangers to

15   her have had to watch those videos through this process.  And

16   that's hard.

17        Because Derringer dosed the victim with meth and because

18   he terrorized her with threats and because he traumatized her

19   with sexual abuse, she does have some holes in her memory.  But

20   as the trial transcript shows, and as the Court today has even

21   indicated, there is a lot of other evidence in the transcript

22   of Mr. Derringer's knowledge that he was being filmed.  And as

23   I've discussed, there is a lot of evidence of his premeditation

24   for this.

25        At the end of the day, Mr. Derringer's not said anything

1    here or in his sentencing memo or his objections to the

2    presentence report that alters his culpability or changes the

3    United States' view on what an appropriate punishment should be

4    in this case.  He keeps trying to point the finger at

5    Walls-Land, but just because he found somebody who was morally

6    debased enough to go along with him on this scheme doesn't mean

7    that he's not responsible.  He absolutely is still responsible.

8         We've asked the Court to run the counts -- or excuse me,

9    run the sentences for Counts 1, 2 and 4 consecutively with

10   Count 5, leading to a total punishment of about 50 years.  And

11   we believe the seriousness of Mr. Derringer's conduct and also

12   his callousness favors a sentence in excess of 30 years.

13        Thank you, Your Honor.

14        THE COURT:  All right.  No further information from the

15   victim, correct, Ms. Melton?

16        MS. MELTON:  No, Your Honor.

17        THE COURT:  All right.  Thank you.

18        Mr. Swinford, any additional remarks before I announce the

19   sentence?

20        MR. SWINFORD:  No, Your Honor.  I'll stand on what was

21   said.

22        THE COURT:  Thank you.

23        These cases are tough cases for everyone.  It's especially

24   tough for the Court that comes into this not having

25   participated in the trial, it's probably an advantage in some

1    ways.  But as indicated, I have thoroughly reviewed not only

2    the transcript that was filed of the victim, but also a draft

3    of the other testimony, realizing it's only a draft.  But also

4    considering all the evidence in the case that has been

5    presented.

6         I do begin the analysis of an appropriate sentence from

7    the guideline range.  In this case, the guideline range is a

8    life term.  And the Court may impose that term by stacking some

9    of the penalties, because there are statutory maximums for each

10   count, for two of the counts, 30 years; and for two other

11   counts, 20 years each.  So I do consider the guidelines as a

12   starting point.  But then I also consider the factors of Title

13   18, Section 3553 in determining what would be an appropriate

14   sentence.

15        Now, in this particular case, Count 1 has a minimum term

16   of 15 years, as does Count 2.  And then there is the maximum

17   term for Counts 4 and 5, there are no minimums.  So the Court

18   does recognize there is some minimum and maximum terms that

19   must be addressed in imposing the sentence.

20        When we look at the factors of 3553, the Court is to

21   consider and finally impose a sentence that would be sufficient

22   but not greater than necessary to reflect the seriousness of

23   the offense, promote respect for the law and provide for a just

24   punishment, also to afford deterrence to criminal conduct, and

25   to protect the public from any future crimes of the defendant.

1   And also provide the defendant with needed educational,

2   vocational, medical care or other corrective treatment.

3        I also consider all the other factors of the statute,

4   including the need to avoid unwarranted sentencing disparities

5   among defendants with similar records who have been found

6   guilty of similar conduct.

7        Thankfully, not too many of these cases come around, and,

8   thankfully, the Court is not in a position to have to consider

9   starting from a life sentence under the guidelines.  It does

10  not mean I shy away from it when those facts are presented.

11       In this particular case, when we look at the nature and

12  circumstances of the offense, they are horrendous.  And the

13  defendant's history and characteristics are a negative.  The

14  Court has a hard time finding any positive characteristics of

15  this particular defendant.  It's not surprising because he's in

16  criminal history category VI with 24 criminal history points,

17  so he's not led what would be called a stellar life to this

18  point.

19       There's no indication in his history that he was prone to

20  engage in this type of specific behavior, sexual assault on

21  children, but that's not unusual.  Because often individuals

22  that are either convicted of sexual abuse or convicted of these

23  particular offenses, producing child pornography effectively or

24  aiding in their production, those individuals generally don't

25  have an extensive criminal history or a criminal history that

1    reflects prior conduct.

2         The guidelines are high for this particular matter for

3    these offenses.  And there has been quite a lot of discussion

4    about why the guidelines are so high for cases that effectively

5    involve child pornography, either the production or the

6    distribution or the possession of child pornography, and why

7    should we have these enhancements.

8         The argument is often made in nearly all cases like this

9    of child pornography when we're talking about distant victims

10   that we shouldn't be imposing lengthy sentences.  And for those

11   that believe that, I would refer them to an article written by

12   Alexander Gelber, who wrote an article entitled Response to

13   Reluctant Rebellion several years ago now that addresses the

14   reason for the enhancements in the guidelines.

15        This particular case demonstrates in very clear terms why

16   there should be those enhancements, why they apply in those

17   cases and why they apply here.

18        When we look at the enhancements, they do reflect the

19   activity involved, they reflect the status of the minor, the

20   fact that the defendant forced the minor to smoke

21   methamphetamine.  And it's obvious the reason that he did it,

22   weakened her response and perhaps prevented her from more

23   forcefully fighting against his advances.

24        She's not to be blamed for this.  She should not feel any

25   blame at all for the activities of a person such as

1  Mr. Derringer, who apparently was very offended by the use of

2  the term "pedophile," but that's really, if we're going to

3  encapsulate the description, that's the best description of

4  this defendant.  It's exactly what he is as reflected by his

5  conduct in this particular case.

6      And while he has expressed remorse, I don't find that

7  that's heartfelt.  I don't find his remorse is heartfelt.

8      And I do find that if he were to be released from a term

9  of incarceration, that he would likely engage in additional

10 criminal activity.

11     This defendant obviously had some sexual problems with the

12 codefendant in the case.  There was quite a bit of discussion

13 about him engaging in sexual activity with a young person.  He

14 apparently bragged to Mr. Walls-Land that had he done so in the

15 past and led to this particular incident here.

16     Did he pick out the victim?  Perhaps not.  But when the

17 opportunity arose, he pounced upon it, an 11-year-old child who

18 became homesick and became the victim of a very serious

19 offense.

20     So in this case, when we look at the seriousness of the

21 offense, there are only a couple that come before this Court

22 that are more serious.  Most of the time they do involve death

23 as opposed to very serious injury, such as that that's occurred

24 here.

25     It is necessary for the Court to impose a sentence that

1   will promote respect for the law and provide a just punishment,

2   and quite frankly, a guideline sentence would do that.  A

3   guideline sentence would also provide deterrence, not only for

4   this defendant, but for others that might be inclined to engage

5   in similar current.

6        And I do want to point to the parties that -- or point out

7   to the parties when we talk about deterrence, we do talk about

8   specific deterrence for this defendant as well as general

9   deterrence for others.

10        And it is necessary to impose a lengthy sentence that will

11   protect the public from any future crimes of this defendant.

12        It is true when we look at his criminal history, there is

13   not sex offenses that are in his history, but there are a

14   variety of other offenses.  He has not shown any respect for

15   the law or an inclination to engage in law-abiding activities.

16   So the Court does consider him to be a continuing threat to the

17   public.

18        There's been arguments made about the need for medical

19   treatment or other corrective treatment, such as substance

20   abuse treatment.  I will be making recommendations to the

21   Bureau of Prisons with regard to treatment programs, and I will

22   include that the defendant participate in a sex offender

23   treatment program as well as mental health treatment and a

24   substance abuse treatment program.

25        I do not find that this defendant has any mental health

1    issues that prevented him from either participating in the

2    trial of the case or that would be an excuse for his conduct in

3    this particular matter.  But at the request of counsel, I will

4    include that as an additional recommendation to the Bureau of

5    Prisons.

6         Then we look at the need to avoid unwarranted sentencing

7    disparities.  And in this particular case, counsel for the

8    defendant has argued for a sentence of 30 years, recognizing

9    the defendant would request the Court to impose something less,

10   while the United States has advocated for a sentence of

11   50 years, which would effectively mean that the Court would run

12   Counts 1 and 2 concurrently, and then would run one of those

13   other two counts consecutive.

14        And, quite frankly, I find that neither of the

15   recommendations would be sufficient to meet the guidelines in

16   this particular case based upon this defendant's activity.

17        Instead, I believe that a guideline sentence is an

18   appropriate sentence, that is a life sentence for this

19   defendant.  And I don't hesitate to impose that in this

20   particular case, not for one second.  And I will also run all

21   of these counts consecutively to produce a total term of 1,200

22   months' imprisonment.

23        The defendant has earned every day of that.

24        I'll announce the sentence.

25        It will be the sentence of this Court pursuant to the

1   Sentencing Reform Act of 1984, as modified by the decisions in

2   *Booker* and *Fanfan*, and I do find the following sentence to be

3   sufficient but not greater than necessary to meet all of the

4   purposes of Title 18, Section 3553(a):

5       And, therefore, it will be the judgment of the Court that

6   the defendant, Richard Eugene Derringer, will be committed to

7   the custody of the Bureau of Prisons for a term of 360 months

8   on Counts 1 and 2 to run consecutively to each other, and

9   240 months on Count 4 and 5 to run consecutively to each other,

10  and to the terms of imprisonment on Counts 1 and 2, to produce

11  a total term of incarceration of 1,200 months.

12      It will be recommended to the Bureau of Prisons that the

13  defendant participate in a sex offender treatment program and

14  that he participate in a mental health program as well as a

15  substance abuse treatment program.

16      Upon release, he will be placed upon supervision for a

17  term of life on Counts 1, 2 and 4, and three years on Count 5

18  to run concurrently, to produce a total term of supervision of

19  life.

20      Within 72 hours of release from the custody of the Bureau

21  of Prisons, he must report in person to the probation office in

22  the district in which he is released.

23      While on supervision, he may not commit another federal,

24  state or local crime, and he must comply with the mandatory and

25  the standard conditions adopted by the Court and that will be

1     set forth in the judgment and commitment order.

2          Special conditions include that he refrain from the use of

3     alcohol, that he refrain from obstructing or attempting to

4     obstruct or tamper in any fashion with the efficiency and

5     accuracy of any prohibited substance testing which is required

6     as a condition of release.

7          He must provide the probation office within seven days of

8     release from the custody of the Bureau of Prisons with a

9     written report in the form that the probation office directs

10    listing each and every prescription medication in his

11    possession, custody or control.  The list includes but is not

12    limited to any prescription medication that contains a

13    controlled substance, and it includes all current, past and

14    outdated or expired prescription medications in his possession,

15    custody or control at the time of the report.

16         He must also notify the probation office immediately, that

17    is within no later than 72 hours, if he receives a prescription

18    for a medication containing a controlled substance, and that

19    would be for the entire period of supervision.  He must provide

20    the probation office with such documentation and verification

21    as the probation office may reasonably request and in a form

22    that it directs.

23         Next, he must comply strictly with the orders of any

24    physician or other prescribing source with respect to the use

25    of all prescription medications, and he must report any theft

1    or destruction of any prescription medication to the probation

2    office within 72 hours.

3         Likewise, he may not purchase, possess, use, distribute or

4    administer any controlled substance or paraphernalia relating

5    to controlled substances, except as prescribed by a physician.

6    He may not frequent places where controlled substances are

7    illegally sold, used, distributed or administered.  And he may

8    not use or consume marijuana, even if that substance were to be

9    prescribed to him by a physician, licensed professional or

10   other person.

11        He will also be subject to the sex offender conditions

12   that have been adopted in this district.  I do find that the

13   following conditions are necessary.  I will also note for the

14   record and for individuals that are present today that may be

15   wondering why the Court would impose these conditions upon a

16   defendant facing such a lengthy sentence, but this Court does

17   so recognizing that, on some occasions in the past, an

18   individual may have a commuted sentence or a reduced sentence,

19   and if he is on supervision, I believe these conditions are

20   absolutely necessary to provide protection of the public.

21        The sex offender conditions include that the defendant

22   must participate in a program for treatment of mental health

23   and sexual disorders and must undergo a sex offender risk

24   assessment, psychosexual evaluation and/or other evaluation as

25   needed.

1          He will be subject to periodic polygraph examinations

2    and/or computer voice stress analysis testing.  That would be

3    at the direction and discretion of the probation office.  And

4    he must follow the rules and regulations of the sex offender

5    treatment program as implemented by the probation office.

6          His residence and employment must be preapproved by the

7    probation office and in compliance with state and local law.

8    He may not frequent, volunteer or work at places where children

9    under the age of 18 congregate, and that would include

10   playgrounds, parks, daycare centers, public swimming pools,

11   youth centers, video arcades and the like, unless approved by

12   the probation officer in advance.  And he may have no contact

13   whatsoever with any identified victim in the case.

14         He may not associate or have verbal, written, telephonic

15   or electronic communications with any person under the age of

16   18 without the permission of the probation officer.  Now, this

17   would not include persons under the age of 18 such as ticket

18   vendors, cashiers, waiters and waitresses with whom he must

19   deal in order to obtain usual and commercial services.

20         I will include a restriction on materials.  He may not

21   possess, view, listen to or go to locations where any form of

22   pornography, sexually stimulating performances or sexually

23   oriented materials, items or services are available.

24         And he may not possess or use a device capable of creating

25   pictures or videos without the approval of the probation

1    office.

2         Now, the Court understands that being able to communicate

3    through cellular telephones and smart phones is often

4    necessary.  But in this particular case, that necessity would

5    not override the need to protect the public, and therefore the

6    Court does impose this condition and direct that it be complied

7    strictly through the probation office.

8         He may not rent or use a post office box or storage

9    facility without the approval of the probation office.

10        He must register as a sex offender as prescribed by state

11   law.

12        I'll also include computer restrictions.  The defendant

13   may not possess or use a computer or any device with access to

14   any online computer service at any location, including place of

15   employment, without the prior written approval of the probation

16   office.  And this would include any internet service provider,

17   bulletin board system or any public or private network or email

18   system.

19        He must also consent to the probation office conducting

20   unannounced examinations of any computer system that he is

21   allowed to use if permission is granted, and any internal or

22   external storage devices which may include retrieval and

23   copying of all memory from the hardware and software, and the

24   removal of such systems for the purpose of conducting a more

25   thorough inspection.

1        He must consent to having installed on his computer any

2   hardware or software to monitor his computer usage and prevent

3   access to particular materials.  And he must also consent to

4   periodic inspection of any installed hardware and software to

5   ensure that it's functioning properly.

6        Next, he must provide the probation office with accurate

7   information about his entire computer system, if he is allowed

8   to possess or use one.  That would be any hardware and software

9   and any internal or external storage devices.  He must also

10  provide all passwords, and he must abide by the rules of the

11  computer restriction and monitoring program.

12       Search conditions are also necessary based upon the

13  defendant's conduct.  He will be required to submit his person,

14  any residence, office, vehicle, or any other property under his

15  control to a search conducted by the probation officer.

16  Failure to submit to a search would be grounds for revocation

17  of supervision.  And he must inform all or any other residents

18  that the premises would be subject to a search according to

19  this condition.

20       I'll include a requirement that the defendant provide the

21  probation office access to any requested financial information.

22  And this is included as a means to allow the probation office

23  to monitor purchases of electronics and peripheral devices, as

24  well as any internet service, either subscribed to or accessed

25  to by the defendant, as well as the amount paid for such

1    services, if he is allowed to utilize such services.

2         Based upon his current financial situation, I'm going to

3    waive the fine requirement in the case, but he will be ordered

4    to pay the United States a special assessment of $400, and that

5    will be due immediately.  The $5,000 special assessment as to

6    Counts 1, 2 and 4 will be waived.

7         The Court previously inquired about restitution and has

8    been advised that the victim in the case is not requesting

9    restitution.  But the Court will also include in the judgment a

10   requirement of forfeiture of any interest that the defendant

11   may otherwise assert in the items listed in the superceding

12   indictment, the forfeiture allegation specifically, and that

13   would include the Alcatel cell phone, model number 5044R; the

14   ZTE cellphone, ZTE N817, serial number listed for those items.

15   The Apple iPhone 6 with serial number listed, and all

16   software and peripherals which are either contained or

17   associated with those listed devices.

18        And then following this proceeding, the defendant will be

19   remanded back to the custody of the United States Marshal

20   pending designation for the location for service of his

21   sentence.

22        That will be the judgment of the Court.

23        In just a moment, I will ask the clerk to advise

24   Mr. Derringer of his appellate rights.  Before I do that, I'll

25   entertain any objections that the parties may have first to the

1   sentence that has been announced, and that would include

2   conditions of supervision; second would be any objections under

3   *United States versus Bostic*.   Under that decision from the

4   Sixth Circuit, any objections not previously raised should be

5   raised at this time so that they may be addressed by the Court

6   to be properly preserved for review on appeal.

7       And then, finally, if the parties would like the Court to

8   make additional findings to support the sentence that has been

9   announced, I will do so if requested.

10      Ms. Melton, I will begin with you.

11      MS. MELTON:   Your Honor, no objections to the sentence or

12  the terms of supervised release.   No *Bostic* objections and no

13  request for further findings.

14      THE COURT:   All right.   Thank you.

15      Mr. Swinford.

16      MR. SWINFORD:   Your Honor, likewise, I have no legal

17  objections to the sentence as announced by the Court at this

18  time.   No *Bostic* objections.

19      I do have two requests.   One for a recommendation, in

20  light of Mr. Derringer -- his mother's letter, a request that

21  the Court recommend that he serve his sentence in a federal

22  facility close to Central Kentucky that his classification

23  permits, recognizing that eventually he may end up at Butner.

24      The other request I have, especially in light of his

25  mother's letter, that his grandfather, who basically raised

1   him, is 95 years old and fell and broke his hip.  I would ask

2   the Court, mainly the U.S. Marshals, if they could transport

3   him to a facility in Central Kentucky so his grandfather can

4   meet him and say good-bye to him.  He is in Litchfield, and

5   this 95-year-old gentleman cannot go in a car that far to see

6   him.  It would be a good-bye.  And I know it's through a

7   window.  So if that's at all possible, I would ask that that be

8   put in the motion.

9        THE COURT:  All right.  With regard to placement, under

10  the First Step Act of 2018, there is a provision that the

11  Bureau of Prisons should attempt to place a defendant at the

12  location closest to his home or to members of his family for

13  which he would qualify.  And I will defer to the Bureau of

14  Prisons in making that determination, in light of the other

15  recommendations that I have made with regard to medical issues,

16  mental health issues and sex abuse treatment.  So I'll defer to

17  the Bureau of Prisons on that issue.

18       With respect to the second issue, and that would be the

19  defendant's placement initially before he's designated, I will

20  leave that to the United States Marshal to keep the defendant

21  at the location it believes would be a secured facility, in

22  light of the information that has been provided to the Court

23  today, and that would relate to the defendant attempting to or

24  assaulting -- either assaulting or attempting to assault the

25  codefendant as they were being transported to Lexington,

1    Ms. Walls-Land.

2        In light of those security concerns, I will not be

3    superceding any decision that would be made by the United

4    States Marshal Service with regard to temporary placement for

5    those reasons.

6        MR. SWINFORD:  I understand, Your Honor.

7        THE COURT:  All right.  Thank you.

8        Madam Clerk.

9        THE CLERK:  You are notified by this Court that you have a

10   right to appeal your case to the Sixth Circuit Court of

11   Appeals, which on proper appeal will review this case and

12   determine if there has or has not been an error of law.

13       If you are unable to pay for the cost of the appeal, you

14   have a right to apply for leave to appeal in forma pauperis,

15   which means you may appeal without paying for it.

16       If you are without the services of an attorney and desire

17   to appeal, upon request, the clerk of this court shall prepare

18   and file forthwith a notice of appeal on your behalf.  With few

19   exceptions, this notice of appeal must be filed within 14 days

20   from the date of entry of the judgment.

21       If you do not have sufficient funds to employ an attorney,

22   the Court of Appeals may appoint your present attorney or

23   another to prosecute the appeal for you.

24       You may request to be released on a reasonable bond

25   pending the appeal.

1      THE COURT:  Thank you.

2      Mr. Derringer, you are being handed what was just read.

3  Please take a moment to review your appellate rights with

4  Counsel.  After you have assured yourself you understand those

5  rights, if you could sign those original document, there is a

6  copy you can keep for your records.

7      Thank you.  Before I recess, Ms. Walls-Land was scheduled

8  for a sentencing hearing at 10:00.  Based upon the activity

9  that I just described, the marshals, I believe, have

10  transported her for medical attention, so we will not be

11  proceeding with her sentencing today.

12      Mr. Gore, I know that you're here today.  If you would

13  like to come up before we recess, we will pick another date.

14  Ms. Melton, could come up as well, please.

15      MR. SWINFORD:  Your Honor, may I be excused?  I have an

16  11:30 in state court.

17      THE COURT:  Yes.  The marshals may transport the defendant

18  to the holding cell at this time, but we will remain in court

19  until the contact of the scheduling issue with Mr. Gore and

20  Ms. Melton.

21      (Bench conference on the record.)

22      THE COURT:  Rather than calling the matter, this relates

23  to Lexington Criminal 19-56, Jacquolyn Walls-Land.

24      I was advised by the marshals this morning, just before we

25  started the hearing at 9:00, that Mr. Derringer had assaulted

1   Ms. Walls as they were being transported in the bus from the

2   Grayson County Detention Center.   And they were separated but

3   that he had gone through the back of the bus and assaulted her

4   in the front of the bus and that she was requesting medical

5   attention.   The marshals had transported her for medical

6   attention.

7        What I would like to do is reschedule this for next

8   Monday, if counsel would be available at that time.   I have a

9   plea hearing at 9:00, that should be finished by 10:00, if

10  you're available.

11       MR. GORE:   I apologize.   I've got a doctor's appointment

12  at 10:30.   I can call the doctor and see --

13       THE COURT:   What about 1:00?

14       THE CLERK:   That would be absolutely fine.

15       THE COURT:   Lisa, can you check and confirm that 1:00 is

16  available on Monday, December 16th.

17       MR. GORE:   I apologize for that, Judge.

18       THE COURT:   That's fine.   I'm catching you off guard, I

19  know you weren't planning for this.

20       Ms. Melton, how does that look on your calendar?

21       MS. MELTON:   That works, Your Honor.

22       THE COURT:   Check real quick if we don't have a conflict.

23  If we do, I'll have the clerk contact you and we'll pick

24  another time.   But that should be -- should be available on

25  Monday, the 16th at 1:00.   So I'll wait until I hear from the

1   scheduling clerk before we fill out the minute sheet.  But if

2   there is a problem, she'll contact you and let you know.

3        MR. GORE:  Thank you for your continuing this so she can

4   get that treatment.

5        THE COURT:  Yes, sir, certainly.

6        (Bench conference concluded.)

7        THE COURT:  Thank you.  The third matter on the docket

8   this morning was scheduled to begin at 11:00, we're past that

9   time now, but I do need to take just a brief recess before that

10  matter is called.  We'll take about a five-minute recess, at

11  that point call the 11:00 matter.

12       (Proceedings concluded at 11:32 a.m.)

13

14

15

16              C E R T I F I C A T E

17       I, Linda S. Mullen, RDR, CRR, do hereby certify that

18  the foregoing is a correct transcript from the record of

19  proceedings in this above-entitled matter.

20  /s/Linda S. Mullen          March 20, 2020
    Linda S. Mullen, RDR, CRR   Date of Certification
21  Official Court Reporter

22

23

24

25